**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

R & R MEDIA GROUP, LLC
113 N Iowa Street
Dodgeville, WI 53533,

Plaintiff,

v.

PEGGY LAURITSEN
3369 Oakgreen Avenue North
Stillwater, MN 55082,

Defendant.

Case No. 24-cv-00856

**DEFENDANT PEGGY LAURITSEN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES**

---

In this litigation, Plaintiff R & R Media Group, LLC's ("R&R") claimed that PLDG, the company it purchased from Defendant Peggy Lauritsen ("Ms. Lauritsen"), had an undisclosed pre-closing "material dispute" with "material customer" UHG. R&R sought both damages for the post-closing loss of UHG as a customer and equitable rescission of the sale of PLDG.

At the conclusion of trial two weeks ago, the Court entered judgment in favor of Ms. Lauritsen and against R&R on all claims, including these UHG claims. But a trial should never have been required to resolve the UHG claims. In response to requests for admission served by Ms. Lauritsen, R&R should have admitted facts establishing that there was no pre-closing "material dispute" between PLDG and UHG. Likewise, R&R should have admitted facts establishing a lack of causation, as UHG terminated its relationship with PLDG for reasons that developed post-closing—namely, the departure of PLDG's



4792376.v1

long-standing employees under R&R's ownership. But R&R unreasonably refused to make these admissions, causing Ms. Lauritsen to incur substantial attorneys' fees to prove her defense at trial. R&R should now be required to pay Ms. Lauritsen for those attorneys' fees.

As discussed further below, Ms. Lauritsen respectfully requests an award of $53,905.02 in attorneys' fees, plus any additional fees that are incurred through further briefing on this motion.[1]

## BACKGROUND

### I. R&R's Allegations Regarding the UHG Claims.

On June 16, 2023, R&R acquired Ms. Lauritsen's business, PLDG. The terms of the sale were set forth in a Stock Purchase Agreement. (ECF No. 57 (the "SPA").) As it relates to this Motion for Attorneys' Fees, the SPA provided a representation that PLDG was not engaged in any "material dispute" with any of its "material customers," which included UHG. (SPA § 3.19(a).)

On January 23, 2024, R&R sent a first indemnification demand letter to Ms. Lauritsen. (ECF No. 31.2) R&R alleged that Ms. Lauritsen had breached Section 3.19(a) of the SPA due to an alleged pre-closing "material dispute" between PLDG and its largest customer, UHG. Ms. Lauritsen denied the allegations in detail, arguing (among other

[1] Further, to the extent that R&R files post-trial motions involving the UHG claims, or pursues an appeal involving the UHG claims, Ms. Lauritsen reserves the right to request additional attorneys' fees incurred in connection therewith.

things) that PLDG lost UHG because of the departure of critical employees under the leadership of R&R's owner, Sara Rahn. (ECF No. 29-1.)

On August 23, 2024, R&R sent a second indemnification demand letter to Ms. Lauritsen. (ECF No. 29-2.) R&R again asserted that there had been a pre-closing "material dispute" between PLDG and UHG. R&R also asserted several additional categories of claims. Ms. Lauritsen again denied the allegations in detail. (ECF No. 29-3.)

On December 3, 2024, R&R filed its Complaint with the Court. (ECF No. 1 ("Compl.").) In its Complaint, R&R again alleged that UHG had an undisclosed "material dispute" with PLDG prior to closing. Among other things, R&R alleged:

A. PLDG was "at a substantial and material risk of losing" UHG prior to closing. (Compl. ¶ 2.)
B. Ms. Lauritsen "engaged in a course of conduct that deceived Rahn regarding the major issues PLDG faced with" UHG. (Compl. ¶ 7.)
C. Ms. Lauritsen "successfully misrepresented that there were no material issues with any of its customers, and concealed facts to the contrary." (Compl. ¶ 8.)
D. "Shortly after acquiring PLDG," R&R "discovered" that Ms. Lauritsen's representation that there was not a "material dispute with any Material Customer" was "false and/or omitted material facts that made it misleading." (Compl. ¶ 31-32.)
E. "UHG had been dissatisfied with PLDG's work for a significant period of time and intended to terminate significant business and/or remove PLDG from its preferred vendor list entirely." (Compl. ¶ 37.)
F. Ms. Lauritsen "knew this was the case before closing on the deal with [R&R], but actively concealed it." (Compl. ¶ 38.)
G. During a meeting held on December 14, 2023, "UHG confirmed that it had been unhappy with PLDG for more than a year…." (Compl. ¶ 52.)
H. R&R "would never have proceeded with the stock purchase if they had known the truth about UHG." (Compl. ¶ 55.)
I. Ms. Lauritsen "knew as much and therefore intentionally misrepresented PLDG's relationship with UHG and concealed evidence to the contrary." (Compl. ¶ 56.)
J. Ms. Lauritsen breached Section 3.19(a) of the SPA as a result, which also amounts to "fraud." (Compl. ¶¶ 111-113.)
K. Ms. Lauritsen "made numerous false statements of fact and material omissions… relating to UHG's relationship with PLDG…." (Compl. ¶ 116.)

L. Ms. Lauritsen "made these misrepresentations with the intent to deceive" R&R and "inducing" R&R "to enter into the SPA." (Compl. ¶ 117.)

As to the specifics of the alleged "material dispute," R&R identified two main interactions with two UHG representatives. First, R&R alleged that Ms. Nikki Cron had "threatened" to pull her work in an email dated June 14, 2023, and then later pulled her work in December 2023. (ECF No. 102-6 (Answers to Discovery) at 5-6,15, 30, 32-34.) Second, R&R alleged that Mr. Rob Hagemann had not been happy with PLDG's services for "over a year" as a result of a 2022 "end of year review," and that "nothing was improved," and that as a result the entire relationship between UHG and PLDG was terminated in 2024. (Id.)

Regarding Ms. Cron's email dated June 14, 2023, it spoke for itself. (Tr. Ex. 113.) It was not a "threat" to pull business. Rather, it reflected the depth and strength of the relationship between PLDG and Ms. Cron. At most, Ms. Cron suggested that she "may" need to "shift" only "some" of her work if levels of service, talent, and turnarounds could not be provided "within the next week or so." (Id.) Many emails showed the PLDG team then immediately addressed Ms. Cron's concern. (See, e.g., Tr. Exs. 113, 118, 119, 120, 121, 122, 123, 124, 125, 128.) And Ms. Cron continued to do business for six more months.

Regarding the limited interactions between PLDG and Mr. Hagemann prior to closing, it consisted of an "end of year review" from October/November 2022, during which some standard items to "keep it up" and "room for improvement" were discussed. (Tr. Ex. 20.) On its face, this was plainly a standard business review, not any "threat" to the relationship or the business.

## II. The Depositions of Nikki Cron and Rob Hagemann.

On March 18, 2026, R&R took the depositions of Ms. Cron and Mr. Hagemann. (ECF Nos 78 & 80.) As discussed in prior filings, Ms. Cron and Mr. Hagemann denied R&R's allegations.

*First*, regarding Ms. Cron, she testified that while she raised a concern with Ms. Gangelhoff in her June 14 email, that concern had nothing to do with her pulling business after closing in December 2023; rather, that occurred due to the departure of key employees from PLDG (such as Ms. Gangelhoff) in December 2023. While Ms. Cron had a concern in June 2023 that certain work had gotten "slower and sloppier" and that, absent improvement, additional workload might have to go to a different vendor, PLDG immediately took the concern seriously. (Cron Dep. Tr. 58:5-12, 62:6-23, 64:10-18.) PLDG "started turning things around" within a very short time frame. PLDG did work faster and dedicated more time to Ms. Cron's projects. (Id. 66:1-12, 69:5-11.) Immediately after Ms. Cron raised concerns in June 2023, "we got back on track." (Id. 82:22-83:13.)

Ms. Cron later pulled all of her unit's work from PLDG in December 2023 because, post-closing, all the relevant PLDG employees resigned: "[I]n that six months everybody that I worked with had helpful historic knowledge of my clients, the processes, the subject matter, they all left." (Cron Dep. Tr. 68:15-25.) This was the "primary driving factor" behind Ms. Cron's decision. (Id. 69:1-4.) "[L]osing more people on the team made it very difficult to want to move forward." (Id. 77:7-9, 73:10-22.) When Ms. Cron received a December 11, 2023, email about Sandy Gangelhoff and Michelle Metcalfe leaving, that was the "decision point" for Ms. Cron pulling her work. (Id. 73:2-9, 77:20-78:1.)



4792376.v1

Consistent with this, Ms. Cron confirmed that the concern she raised in June 2023 did not play any role in the decision she made to pull business in December 2023:

> Q. In your mind when you are making that decision in December of 2023, does what happened in June 2023 play any role in that decision you made in December of 2023?
> A. I don't believe so.
> Q. ... Was the decision in December of 2023 just because of the departures of all these different individuals?
> A. I think I feared that continuing to work would be extraordinarily painful to try to start from ground level again to work with a team that had a lot of orientation and learning to do in terms of gaining institutional knowledge. And there's a period of time where you need to really learn about the business, learn about the topics at hand to be able to be fully functioning up and running and good at it.

(Cron Dep. Tr. 83:14-23.)

*Second*, regarding Mr. Hagemann, he testified that any meetings he had with PLDG prior to closing were "business per usual" meetings he would have had with other agency partners, and that UHG's reason for terminating the business relationship in May 2024 had nothing to do with any events occurring prior to closing, but rather due to the departure of key employees and Ms. Rahn's concerning conduct and the direction of PLDG.

While Mr. Hagemann conducted an end-of-year review with PLDG at the end of 2022, that was something he did with all agencies, not just PLDG. (Hagemann Dep. Tr. 19:3-28:2.) Any comments Mr. Hagemann made to PLDG that R&R later interpreted to be critical were similar to those made to all agency partners—to acknowledge the opportunity to "elevate the work" and "to keep pushing and delivering greater work was the whole purpose of these meetings." (Id. 27:16-28:2.) At the end-of-year review in 2022, he did not have any concern about UHG's relationship with PLDG, and his team was not considering

or contemplating terminating its relationship with PLDG or reducing the business it was doing with PLDG. Rather, everything was "business per usual." (Id. 69:19-71:5.)

Regarding Ms. Cron's June 2023 email, Mr. Hagemann testified that PLDG's immediate response to Ms. Cron was "an expected response" and "would not have caused concern." (Hagemann Dep. Tr. 41:19-42:3.) Mr. Hagemann understood the June 2023 issue to be "normal business exchanges," and testified that his team was not looking to terminate its relationship with PLDG in June or July 2023, nor reduce its business with PLDG in June or July 2023. (Id. 72:9-17, 74:11-24.)

Even after the departure of key employees in December 2023, and despite a "heightened concern" about the departures, Mr. Hagemann did not take any immediate steps to reduce PLDG's work with UHG. (Hagemann Dep. Tr. 52:5-55:24, 57:3-8, 76:22-82:24.) Mr. Hagemann's discussion with Ms. Rahn in December 2023 was "business as usual" and was simply about "elevating or raising the bar of the work," which was "the common ask among all our partners." (Id. 58:3-8, 60:22-61:7; 76:14-21.)

UHG's decision to stop working with PLDG in May 2024 was separate from Ms. Cron's decision to pull her unit's work. The May 2024 decision was an enterprise level decision made as part of an overall "agency optimization effort" at UHG to streamline the agency partners with whom UHG worked, of whom there were more than 50 vendors. (Hagemann Dep. Tr. 65:12-68:2.) PLDG did not make the cut due to challenges that arose following closing with PLDG "being anything but PLDG" and concerns with "where PLDG was going" with new ownership "in charge" and that under new ownership there was an "imbalance in terms of the outputs that came thereafter." (Id. 85:5-14.) That is,

there "was significant change within" PLDG under Ms. Rahn's ownership, and UHG had concerns with "the impact of where [Ms. Rahn] was pushing the business on the relationship and the quality of the work that we were seeing." (Id. 86:15-87:2.) This included the departure of key employees in December 2023, which was "impacting the larger relationship," not just Ms. Cron's business. (Id. 56:1-11.)

Ultimately, Mr. Hagemann confirmed that no issues from prior to closing in June of 2023 impacted the termination decision that occurred in 2024:

> Q. … As part of this process, this optimization, this RFI process, ultimately the decision to terminate the decision with PLDG, were there issues from prior to June of 2023 that impacted that termination decision?
> A. No, I don't believe so.

(Hagemann Dep. Tr. 87:8-13.) Rather, Mr. Hagemann confirmed it was a "concern with where PLDG was going" under new leadership. (Id. 86:7-87:2.)

## III. The Requests for Admission.

On April 21, 2026, Ms. Lauritsen sent a letter to R&R requesting the dismissal of the UHG claims in light of the depositions of Ms. Cron and Mr. Hagemann. (Wheeler Decl. ¶ 17.) That same day, Ms. Lauritsen also served 15 requests for admission on R&R regarding the UHG Claims. (Wheeler Decl. ¶ 18 & Ex. C.) On May 19, 2026, R&R served responses to the requests for admission. (Wheeler Decl. ¶ 19 & Ex. D.) The substance of the most material denials is as follows:

> **REQUEST NO. 1:** R&R denied that "UHG had not been dissatisfied with PLDG's services and work product for at least a year prior to June 16, 2023."

**REQUEST NO. 2:** R&R denied that "PLDG was not at risk of losing UHG as a customer as of June 16, 2023."

**REQUEST NO. 3:** R&R denied that "UHG did not have a material dispute with PLDG as of June 16, 2023."

**REQUEST NO. 4:** R&R denied that "there was not a clear and material threat to PLDG's business with UHG as of June 16, 2023."

**REQUEST NO. 5:** R&R denied that **"**UHG did not intend to remove PLDG from its preferred vendor list as of June 16, 2023."

**REQUEST NO. 6:** R&R denied that "Ms. Lauritsen did not, in connection with the Transaction, conceal any material dispute between PLDG and UHG."

**REQUEST NO. 8:** R&R denied that the "singular reason" for Nikki Cron pulling her work from PLDG in December 2023 was "because of the resignations of PLDG employees between June and December 2023."

**REQUEST NO. 9:** R&R denied that "Nikki Cron pulled her work from PLDG in December 2023 for reasons unrelated to any issues with PLDG that existed as of June 16, 2023."

**REQUEST NO. 10:** R&R denied that "UHG terminated its relationship with PLDG because of the direction of PLDG under its new ownership by R&R and concerning behavior exhibited by Sara Rahn."

**REQUEST NO. 11:** R&R denied that "UHG terminated its relationship with PLDG for reasons unrelated to any issues or disputes with PLDG that existed as of June 16, 2023."

**REQUEST NO. 13:** R&R denied that "UHG had not indicated to PLDG that UHG intended to terminate or materially reduce its business relations with PLDG as of June 16, 2023."

**REQUEST NO. 14:** R&R denied that "Ms. Lauritsen did not breach the SPA with respect to UHG's status as a customer of PLDG."

**REQUEST NO. 15:** R&R denied that Ms. Lauritsen did not "misrepresent the status of the situation with UHG as of closing."

(Wheeler Decl. Exs. C & D.)

## IV. The Trial.

At trial, the UHG claims were one of four categories of claims asserted by R&R, including prebill claims, gift claims, and email deletion claims. Regarding the UHG claims, Ms. Lauritsen presented the deposition testimony of Ms. Cron and Mr. Hagemann. Ms. Lauritsen also cross-examined Ms. Rahn on the issue. Ms. Lauritsen also presented testimony from Ms. Lauritsen, Ms. Amy Clarke (the president of PLDG), Ms. Sandy Gangelhoff (the saleswoman responsible for UHG), and Ms. Bernadette Fox (who worked under Ms. Gangelhoff), regarding the alleged issues with Ms. Cron and Mr. Hagemann. Ms. Lauritsen also presented testimony from a number of PLDG employees establishing their departures and the reasons for their departure. These employees testified about the impact the departures and Ms. Rahn's other leadership decisions had on PLDG's ability to perform work for its customers, including UHG. This testimony included Sara Rogge, Kelly Keller, Kali Ghazi, Shauna Block, and Linda Gosslin (via deposition). Dozens of

exhibits were offered and admitted regarding the UHG claims, employee departures, and leadership issues under Ms. Rahn's ownership.

At the conclusion of trial, the Court found in favor of Ms. Lauritsen and entered judgment in favor of Ms. Lauritsen and against R&R on all claims, including the UHG claims. (ECF No. 124 (Judgment).) As it relates to the UHG claims, the Court made the following most relevant findings. (ECF No. 127.)

Regarding Rob Hagemann, the communications from Mr. Hagemann fell "into the background [at trial], and I think appropriately so," as "there was nothing that Rob Hagemann said or suggested or the PowerPoint at the end-of-the-year wrap-up in 2022 [that] really constituted anything even close to notice of some … problems that warranted disclosure to… Sara Rahn…." (ECF No. 127 at 6:3-13.)

Regarding Nikki Cron, "the failure to disclose the Nikki Cron email did not violate any of the provisions in the stock purchase agreement." (ECF No. 127 at 6:15-18.) "[T]he Nikki Cron email did not indicate that [UHG] had a dispute with PLDG," and Section 3.19(a) of the SPA required the parties to have "adverse positions, and nobody took any adverse positions here." (Id. 8:10-15.) Ms. Cron "had a problem," "PLDG didn't disagree with it," "[t]hey said 'Yeah, we want to do better.'" (Id. 9:6-8.)

Further, Ms. Cron's email "really was not an unusual occurrence" and "wasn't a material event." (ECF No. 127 at 6:18-25.) Ms. Cron's email was "not the kind of things that represented a crisis, a risk to the relationship," but rather "demonstrated" the "depth of the relationship between Nikki Cron and the people that she worked with at PLDG." (Id. 7:14-22.) The interaction "wasn't an event that was outside normal client service

operations." (Id. 9:18-24.) Relatedly, Ms. Cron in her email did not indicate "they're going to terminate contracts or… withdraw contracts"; she "didn't express the intent to withdraw work." (Id. 9:9-17.) And PLDG's response to Ms. Cron's email was "an appropriate one" that "didn't rise to the level of a materiality that violated any of the provisions… in the stock purchase agreement to not… disclose it." (Id. 7:23-8:2.)

And regarding the causation issue, "there is no causation of any damage from the failure to disclose the Nikki Cron email." (ECF No. 127 at 10:23-11:4.) "Nikki Cron and Rob Hagemann both specifically testified that any pre-closing problems with UHG and PLDG were just not related to the reasons that UHG didn't continue… with the work." (Id. 14:22-25.) Rather, as the deposition testimony made clear, there were "two primary causes" for the ending of the UHG relationship. (Id. 10:23-11:4.) First, the "enterprise-wide" decision was a "company-wide reassessment" that had "nothing to do with the Nikki Cron email," but rather the fact that "PLDG was not in a good position to respond" due to the departure of "the vast majority of the incumbent employees." (Id. 11:16-25.) Second, it was "pretty clear" that Ms. Cron "counted on people who knew well all of the details of the complicated brand standards of [UHG]… and that after the departure of the… employees from PLDG, the new employees that were brought in just didn't have the facility to produce work that met the standards that Nikki Cron expected." (Id. 14:14-21.)

Further, the departures were the result of "decisions that Sara Rahn made in managing the company." (ECF No. 127 at 11:21-25.) "[T]he evidence was really quite compelling that changes that Sara Rahn made in the operation of the business… had alienated the incumbent employees, and their testimony was… quite compelling and very

credible that they left for reasons that had nothing to do with Peggy Lauritsen…." (Id. 12:4-14.)

With the trial concluded in favor of Ms. Lauritsen on these UHG claims, Ms. Lauritsen now respectfully requests an award of attorneys' fees for R&R's failure to make admissions on the UHG claims that would have avoided the need (and cost) for a significant portion of the trial and work leading up to trial.

## ARGUMENT

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, a party may serve on any other party a written request to admit the truth of any matter relating to "facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 36(a). If the responding party does not admit the request, the answer must "specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). If the receiving party fails to admit what was requested to be admitted and the requesting party later proves the matter true, the Court "must" award attorney's fees "incurred in making that proof," unless one of four exceptions applies: (A) the request was held objectionable under Rule 36(a); (B) the admission sought was of no substantial importance; (C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or (D) there was other good reason for the failure to admit. Fed. R. Civ. P. 37(c)(2).

Here, an award of attorneys' fees is warranted with respect to the failure to admit various items regarding the UHG claims for several reasons.

## I. <u>Ms. Lauritsen Proved the UHG Matters True at Trial</u>.

As set forth in detail in the background section above, there is no doubt that Ms. Lauritsen proved the UHG matters true at trial. This was accomplished through a combination of: (a) the deposition transcripts of Nikki Cron and Rob Hagemann; (b) the cross-examination of Sara Rahn; (c) the direct examinations of Peggy Lauritsen, Amy Clarke, Sandy Gangelhoff, Bernadette Fox, Sara Rogge, Shauna Block, Kelly Keller, and Kali Ghazi; (d) many exhibits directly regarding Nikki Cron, Rob Hagemann, and the relationship between PLDG and UHG; and (e) many exhibits regarding the departures of PLDG employees.

Whether explicitly or implicitly, the Court found in favor of Ms. Lauritsen on each of the matters raised in the requests for admission. Ms. Lauritsen will briefly address the more pertinent requests below.

**REQUEST NO. 1:** R&R denied that "UHG had not been dissatisfied with PLDG's services and work product for at least a year prior to June 16, 2023." But the Court found that "there was nothing that Rob Hagemann said or suggested or the PowerPoint at the end-of-the-year wrap-up in 2022 [that] really constituted anything even close to notice of some prices or problems that warranted disclosure to… Sara Rahn…." (ECF No. 127 at 6:3-13.)

**REQUEST NO. 2:** R&R denied that "PLDG was not at risk of losing UHG as a customer as of June 16, 2023." But in addition to the Rob Hagemann finding discussed in connection with Request No. 1, the Court found that Ms. Cron's email "really was not an unusual occurrence" and "wasn't a material event." (ECF No. 127 at 6:18-25.) That is, Ms. Cron's email was "not the kind of things that represented a crisis, a risk to the relationship,"



4792376.v1

but rather "demonstrated" the "depth of the relationship between Nikki Cron and the people that she worked with at PLDG." (ECF No. 127 at 7:14-22.)

**REQUEST NO. 3:** R&R denied that "UHG did not have a material dispute with PLDG as of June 16, 2023." But the Court found that "the Nikki Cron email did not indicate that [UHG] had a dispute with PLDG," and Section 3.19(a) of the SPA required the parties to have "adverse positions, and nobody took any adverse positions here." (ECF No. 127 at 8:10-15.) Further, Ms. Cron in her email did not indicate "they're going to terminate contracts or… withdraw contracts"; she "didn't express the intent to withdraw work." (ECF No. 127 at 9:9-17.)

**REQUEST NO. 4:** R&R denied that "there was not a clear and material threat to PLDG's business with UHG as of June 16, 2023." But in addition to the Rob Hagemann finding discussed in connection with Request No. 1, the Court found that Ms. Cron's email "really was not an unusual occurrence" and "wasn't a material event." (ECF No. 127 at 6:18-25.) That is, Ms. Cron's email was "not the kind of things that represented a crisis, a risk to the relationship," but rather "demonstrated" the "depth of the relationship between Nikki Cron and the people that she worked with at PLDG." (ECF No. 127 at 7:14-22.) Further, Ms. Cron in her email did not indicate "they're going to terminate contracts or… withdraw contracts"; she "didn't express the intent to withdraw work." (ECF No. 127 at 9:9-17.)

**REQUEST NO. 5:** R&R denied that **"**UHG did not intend to remove PLDG from its preferred vendor list as of June 16, 2023." But in addition to the Rob Hagemann finding discussed in connection with Request No. 1, the Court found that Ms. Cron's email "really



4792376.v1

was not an unusual occurrence" and "wasn't a material event." (ECF No. 127 at 6:18-25.) That is, Ms. Cron's email was "not the kind of things that represented a crisis, a risk to the relationship," but rather "demonstrated" the "depth of the relationship between Nikki Cron and the people that she worked with at PLDG." (ECF No. 127 at 7:14-22.) Further, Ms. Cron in her email did not indicate "they're going to terminate contracts or… withdraw contracts"; she "didn't express the intent to withdraw work." (ECF No. 127 at 9:9-17.)

**REQUEST NO. 6:** R&R denied "Ms. Lauritsen did not, in connection with the Transaction, conceal any material dispute between PLDG and UHG." But given the finding that there was no material dispute (as discussed for Request No. 3), no material dispute could have been concealed.

**REQUEST NO. 8:** R&R denied that the "singular reason" for Nikki Cron pulling her work from PLDG in December 2023 was "because of the resignations of PLDG employees between June and December 2023." But the Court found that it was "pretty clear" that Ms. Cron "counted on people who knew well all of the details of the complicated brand standards of [UHG]… and that after the departure of the… employees from PLDG, the new employees that were brought in just didn't have the facility to produce work that met the standards that Nikki Cron expected." (ECF No. 127 at 14:14-21.) Further, "Nikki Cron and Rob Hagemann both specifically testified that any pre-closing problems with UHG and PLDG were just not related to the reasons that UHG didn't continue… with the work." (ECF No. 127 at 14:22-25.)

**REQUEST NO. 9:** R&R denied that "Nikki Cron pulled her work from PLDG in December 2023 for reasons unrelated to any issues with PLDG that existed as of June 16,

2023." But the Court found that "Nikki Cron and Rob Hagemann both specifically testified that any pre-closing problems with UHG and PLDG were just not related to the reasons that UHG didn't continue… with the work." (ECF No. 127 at 14:22-25.)

**REQUEST NO. 10:** R&R denied that "UHG terminated its relationship with PLDG because of the direction of PLDG under its new ownership by R&R and concerning behavior exhibited by Sara Rahn." But the Court found that the "enterprise-wide" decision was a "company-wide reassessment" that had "nothing to do with the Nikki Cron email," but rather the fact that "PLDG was not in a good position to respond" due to the departure of "the vast majority of the incumbent employees." (ECF No. 127 at 11:16-25.)

**REQUEST NO. 11:** R&R denied that "UHG terminated its relationship with PLDG for reasons unrelated to any issues or disputes with PLDG that existed as of June 16, 2023." But the Court found that "Nikki Cron and Rob Hagemann both specifically testified that any pre-closing problems with UHG and PLDG were just not related to the reasons that UHG didn't continue… with the work." (ECF No. 127 at 14:22-25.)

**REQUEST NO. 13:** R&R denied that "UHG had not indicated to PLDG that UHG intended to terminate or materially reduce its business relations with PLDG as of June 16, 2023." But the Court found that Ms. Cron in her email did not indicate "they're going to terminate contracts or… withdraw contracts"; she "didn't express the intent to withdraw work." (ECF No. 127 at 9:9-17.)

**REQUEST NO. 14:** R&R denied that "Ms. Lauritsen did not breach the SPA with respect to UHG's status as a customer of PLDG." But the Court found that PLDG's response to Ms. Cron's email was "an appropriate one" that "didn't rise to the level of a

materiality that violated any of the provisions… in the stock purchase agreement to not… disclose it." (ECF No. 127 at 7:23-8:2.)

**REQUEST NO. 15:** R&R denied that Ms. Lauritsen did not "misrepresent the status of the situation with UHG as of closing." But the Court again found that PLDG's response to Ms. Cron's email was "an appropriate one" that "didn't rise to the level of a materiality that violated any of the provisions… in the stock purchase agreement to not… disclose it." (ECF No. 127 at 7:23-8:2.)

Therefore, Ms. Lauritsen proved at trial the substance of each of these requests for admissions. Had R&R made these admissions, trial on these various UHG issues and claims would have been completely unnecessary, as R&R would have been rendered unable to prove either liability or causation.

## II. <u>The Court Should Award Fees under Rule 37(c)(2).</u>

Given that Ms. Lauritsen proved the UHG matters true at trial, the Court "must" award attorneys' fees to Ms. Lauritsen unless one of four exceptions is met under Fed. R. Civ. P. 37(c)(2). None of the exceptions apply here.

*First*, regarding Rule 37(c)(2)(A), no request was held to be objectionable. R&R did not object to the vast majority of the requests for admissions. While R&R did object to two requests (No. 3 and No. 12), on the basis that it "calls for a legal conclusion," R&R nevertheless addressed the substance and denied the request. If R&R wished to rest on its objection, it should not have denied the request, but rather only offered its objection so that Ms. Lauritsen could have brought a timely Rule 36 motion to resolve the objection. Fed. R. Civ. P. 36(a)(6). Because R&R did not do so, it cannot now rely on an objection that it

waived by responding to the substance of the request. And in any event, the objection is improper and could not be sustained, as Rule 36 specifically permits requests for admission relating to "the application of law to fact." Fed. R. Civ. P. 36(a)(1)(A).

*Second*, regarding Rule 37(c)(2)(B), the admissions were not just of substantial importance. They were of critical importance. The admissions addressed R&R's core allegations that supported its UHG claims. Had the admissions been made, no trial on the UHG claims would have been necessary as the claims would have been defeated.

*Third*, regarding Rule 37(c)(2)(C), R&R did not have a reasonable ground to believe that it might prevail on the matter. As to the requests regarding liability, the Rob Hagemann "end of year" review and Nikki Cron June 14 email speak for themselves. Nowhere do these documents identify any sort of "material dispute" or "threat" to the business or relationship. But lest there be any doubt, Mr. Hagemann and Ms. Cron had their depositions taken, and each firmly rejected R&R's theories of the case. Critically, these depositions were taken a month before Ms. Lauritsen served her requests for admission. That is, when R&R denied each of the requests for admission, it did so with full knowledge of the testimony that had been provided at these depositions. In light of these depositions, R&R could not have a reasonable ground for its denials.

As to the issue of causation, the circumstances of the loss of Ms. Cron's work and then the entire UHG relationship are crystal clear. Ms. Cron did not move her work in June 2023. Rather, she moved her work in December 2023. What happened between June and December 2023? The exits of most of PLDG's staff under Ms. Rahn's ownership, including several critical employees, like Ms. Gangelhoff. These circumstances were well known to

R&R when it denied the requests for admission. And regarding the loss of the entire UHG relationship, R&R was the one who participated in the RFI process in early 2024, the result of which was the loss of the relationship. R&R knew that process had nothing to do with anything that occurred prior to closing.

But again, lest there be any doubt, Ms. Cron and Mr. Hagemann were asked about these causation issues at their deposition, and each testified that the reasons for the loss of the UHG work had nothing to do with anything that occurred prior to closing, but rather due to issues that arose under Ms. Rahn's ownership. And again, R&R knew about this deposition testimony when it responded to the requests for admission. Yet R&R decided to deny all the requests related to causation and to instead proceed to trial.

In light of all of this, R&R could not have had any reasonable ground to believe it might prevail on the UHG claim.

*Fourth*, regarding Rule 37(c)(2)(D), Ms. Lauritsen cannot ascertain any purported "good reason for the failure to admit" that will be offered by R&R. As set forth in the above discussion regarding Rule 37(c)(2)(C), R&R had no reasonable ground for the denial, and likewise had no good reason for the failure to admit.

Therefore, as no exception applies, the Court "must" award to Ms. Lauritsen the attorneys' fees she "incurred in making" the proof of the requested admissions.

## III. The Court Should Award $53,905.02 in Attorneys' Fees, Plus Any Additional Fees Incurred in Additional Briefing.

Regarding the amount of attorneys' fees, Ms. Lauritsen respectfully requests an award of **$53,905.02** based on **132.27** hours, plus any additional fees that are incurred through further briefing on this issue.

Under Rule 37(c)(2), the Court "must" award attorneys' fees "incurred in making" the "proof" of the denied admissions. This requires a "causal nexus" between the fees claimed and the failure to admit. Hicklin Eng'g, L.C. v. Bartell, 2005 WL 3805914, at *1 (E.D. Wis. Mar. 31, 2005). Stated differently, the Court may ask "if the party to whom the requests were sent had admitted the matters that it should have admitted, which facts would the propounding party not have to prove?" Id.

Further, an award of fees must be "reasonable." Fed. R. Civ. P. 37(c)(2). Generally, to determine a reasonable fee, the Court determines a reasonable number of hours multiplied by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). The Court may look at various factors in determining this amount, such as the amount involved, the results obtained, the skill required, and the novelty of the questions presented. Id. at 434 n.9. In assessing reasonableness, the court's goal "is to do rough justice, not to achieve auditing perfection." Fox v. Vice, 563 U.S. 826, 838 (2011). "[T]rial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." Id.

With this background in mind, the requested amount of fees is warranted for the following reasons.

*First*, regarding the causal nexus, Ms. Lauritsen's counsel has supplied to the Court a list of every billing entry incurred from May 20, 2026, through July 31, 2026. (Wheeler Decl. ¶¶ 4-5 & Exs. A & B.) This date range was used because R&R served the denial of the requests for admissions on May 19, 2026. (Wheeler Decl. ¶ 19.)

From this list of all time entries, counsel has removed from its request the time entries that entirely related to other claims, not the UHG claims, or which would have been necessary to incur in their entirety even had the admissions been made. These are the entries highlighted in yellow in Exhibits A and B. One example is preparing for the testimony of Roben Hunter, who did not ultimately testify, but who would not have addressed the UHG claims anyways. Another example is the bill of costs, which would have been drafted and filed in the same amount even had the UHG admissions been made before trial.

Counsel has also identified the time entries that entirely related to the UHG claims. These are the entries highlighted in green in Exhibits A and B. An example includes entries related to this motion, which are entirely attributable to R&R's refusal to admit the UHG matters. Other examples include preparing for the testimony of certain witnesses—Bernadette Fox, Shauna Block, Kelly Keller, Sara Rogge, and Kali Ghazi—who would not have been necessary witnesses at trial had the UHG admissions been made. That is, these witnesses testified almost entirely about either liability or causation issues for the UHG claims. While several were briefly asked about the "gift" claim, they would not have been needed to be called at trial for solely that purpose. (Wheeler Decl. ¶ 8.) For these time entries, Ms. Lauritsen requests $17,953.62 for 41.8 hours. (Wheeler Decl. ¶ 9 & Ex. B at 3.)

The remaining entries involved work on both UHG claims and other claims, and are highlighted in blue. These entries would have been required to have been performed even had the admissions been made, but only in part—not at the full amounts that were actually incurred. Said differently, had the admissions been made, smaller versions of these time entries would have still been necessary, but not the full amounts that were actually incurred.

Given the nature of the issues and the interrelation of the claims for many witnesses and evidence, it was not possible to segregate each time entry between UHG claims and non-UHG claims with mathematical precision. (Wheeler Decl. ¶ 10.) Consider, for example, the testimony of Sandy Gangelhoff. Ms. Gangelhoff extensively testified about the UHG issues. But she also testified at length about the prebill claim. Or consider the trial brief. While a significant portion of the trial brief was dedicated to the UHG issues, other portions were not.

For these blue time entries, Ms. Lauritsen requests that 1/3 of the total of these entries be awarded in connection with the failure to admit the UHG claims. This request is premised on calculations derived from several places. In the Court's decision on this matter, approximately 9 of the 30 substantive pages of the transcript focused on the UHG claims. (ECF No. 127.) In Defendant's trial brief, approximately 12 of the 34 pages focused on the UHG claims. (ECF No. 62.) In Defendant's response to Plaintiff's trial brief, approximately 2 of the 5 pages focused on the UHG claims. (ECF No. 104.) In Plaintiff's response to Defendant's trial brief, approximately 15 of the 40 pages focused on the UHG claims. (ECF No. 95.) In Plaintiff's closing PowerPoint, 10 of the 24 substantive slides are focused on the UHG claims. (ECF No. 126.) And financially, the UHG claim was by far

the most significant, given that R&R sought to attribute the loss of 60-plus percent of PLDG's annual revenues—millions of dollars annually—to alleged breaches or misrepresentations by Ms. Lauritsen.

From all of this, Ms. Lauritsen believes that 1/3 is a reasonable apportionment for the pretrial and trial work that cannot be readily segregated into the different claim "buckets" with mathematical precision.[2] It cannot be disputed that a substantial portion of the pretrial work and trial work involved the UHG claims, and had the UHG claims been dismissed, the pretrial work and trial itself would have been considerably shorter. See, e.g., BNSF Ry. Co. v. Gilster-Mary Lee Corp., 2017 WL 9531979, at *3(S.D. Ill. Jan. 18, 2017) (given multiple issues discussed at deposition, including some beyond scope of requests for admission, the court awarded half of attorney's fees incurred at deposition due to failure to admit). For these blue time entries, the total hours are 271.4 and the total fees are $107,854.21. (Wheeler Decl. ¶ 11 & Ex. B at 9.) Divided by 3, Ms. Lauritsen requests $35,951.40 at 90.47 hours. (Wheeler Decl. ¶ 11 & Ex. B at 9.) There is more than a sufficient causal nexus for these time entries to the UHG claims and R&R refusal to admit the lack of liability and causation.

Together between the green and blue categories, Ms. Lauritsen requests $53,905.22 for 132.27 hours as having a causal nexus to R&R's refusal to admit the lack of liability and causation on the UHG claims. (Wheeler Decl. ¶ 12.)

---

[2] Given the Court reviewed all the pretrial materials and trial exhibits and presided over the bench trial, Ms. Lauritsen defers to the Court's discretion if the Court believes a different percentage is more appropriate.

*Second*, regarding the reasonableness of the rate, Ms. Lauritsen offers several calculations for the Court's evaluation. For the total request of $53,905.02 at 132.27 hours, there is a blended rate of $407.54 per hour. This is lower than Mr. Wheeler's standard rate due to the usage of an associate (Ms. Diwik), and various courtesy discounts and writeoffs. (Wheeler Decl. ¶¶ 7 & 13-14; Wheeler Decl. Exs. A & B.)

If the Court wishes to evaluate the rates on a partner versus associate basis, Ms. Lauritsen's primary counsel, Mr. Wheeler, has a standard rate of $460, which is what he initially charged on the relevant entries. (Wheeler Decl. ¶ 13.) However, that rate was ultimately reduced through an occasional courtesy discount. His "applied" rate for the relevant entries was ultimately $445.04. (Wheeler Decl. ¶ 12.)

Likewise, the second chair at trial, Ms. Diwik, has a standard rate of $330, which is what she initially charged on the relevant entries. But again, her rate was ultimately reduced through an occasional courtesy discount. Her "applied" rate for the relevant entries was ultimately $308.62. (Wheeler Decl. ¶ 12.)

The rates charged before any discounts were counsel's standard rates, which are generally the best evidence of market rates. See Pickett v. Sheridan Health Care Ctr., 664 F.3d 632, 640 (7th Cir. 2011) ("[A] reasonable hourly rate [is] one that is derived from the market rate for the services rendered [and] presume[s] that an attorney's actual billing rate for similar litigation is appropriate to use as the market rate." (internal citations omitted)); Johnson v. GDF, Inc., 668 F.3d 927, 933 (7th Cir. 2012) (best evidence "of an attorney's market rate is his or her actual billing rate for similar work"). Further, Ms. Lauritsen has paid these rates on a monthly basis. (Wheeler Decl. ¶¶ 13-14; see Broome v. Kohn L. Firm,

S.C., No. 18-CV-860-JDP, 2019 WL 1595864, at *2 (W.D. Wis. Apr. 15, 2019) ("[T]he most persuasive evidence of reasonableness is the hourly rate that clients actually pay….").

Further, such rates are standard in the Western District of Wisconsin. See Averbeck v. Lincoln Nat'l Life Ins. Co., No. 20-CV-420-JDP, 2023 WL 6307414, at *1 (W.D. Wis. Sept. 28, 2023) (approving $450 for shareholders and $300 for associates); Broome, 2019 WL 1595864, at *2 (approving $450 rate). This is particularly true given that this was a complex business sale dispute, which was vigorously litigated for over 18 months. The amount in dispute was very significant, as R&R sought over $3 million in damages/rescission for a $2 million sale of a business.

*Third*, regarding the reasonableness of the hours, 132.27 hours over two-and-a-half months of extensive pretrial work and trial itself is reasonable. These hours included sifting through hundreds (if not thousands) of potential exhibits and outlining what was originally to be a two-week trial with a dozen witnesses.

The reasonableness of these hours is particularly true given the critical importance of the UHG issues at trial. At trial, R&R sought to rescind a $2 million sale on the basis of the UHG claims. R&R sought damages in excess of $3 million, largely due to the loss of UHG. It was critical for Ms. Lauritsen to be thoroughly prepared to defeat such a significant claim by preparing for all possible arguments and evidence. Even then, as the hours reflect, Ms. Lauritsen narrowly and thoughtfully selected the motions in limine she filed and limited the witnesses she could have called.

Ultimately, the case started with UHG, and it is now ending with UHG. Though other claims existed, the chief thrust of this entire dispute, the litigation, and the trial were

the UHG claims. But the UHG claims should never have been presented at trial. After the depositions of Nikki Cron and Rob Hagemann, R&R should have admitted that it could not prove liability or causation. R&R declined to do so. R&R must now bear the consequences of its litigation strategy.

## CONCLUSION

For the foregoing reasons, Peggy Lauritsen respectfully requests that the Court grant her Motion for Attorneys' Fees in its entirety.

Dated: July 31, 2026

**FELHABER LARSON**

By: */s/ Brandon J. Wheeler*

Brandon J. Wheeler, MN #396336
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402-4504
Telephone: (612) 339-6321
Facsimile: (612) 338-0535
bwheeler@felhaber.com

**ATTORNEYS FOR DEFENDANT**