UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

R&R MEDIA GROUP, LLC,

Plaintiff,

v. Case No. 24-cv-00856

PEGGY LAURITSEN,

Defendant.

# PLAINTIFF'S MOTION TO AMEND, MAKE ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND/OR TO CLARIFY FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO FED. R. CIV. P. 52(b)

Plaintiff R&R Media Group, LLC ("R&R") respectfully moves the Court, pursuant to Federal Rule of Civil Procedure 52(b),[1] for an order amending certain findings of fact and conclusions of law or, where appropriate, making additional findings and/or further clarifying its findings.[2] The reasons and grounds for this motion are as follows.

[1] Plaintiff wishes to note for the Court that part of the reason it is requesting the Court expand on and/or clarify some of its findings is because it believes there are some ambiguities which may directly affect Plaintiff's ongoing reporting obligations, including to its SBA underwriting bank and to external compliance auditors. Plaintiff understands that this motion is not supposed to be a re-litigation of trial issues and thus seeks only confirmation and clarity regarding some of the Court's findings to ensure the record is clear.

[2] Plaintiff is separately filing a short motion under Fed. R. Civ. P. 59(e) contemporaneously with the filing of this motion, in case the Court determines that any amendments, additions or clarifications made in response to this motion also justify altering or amending the judgment. For convenience and efficiency, the Rule 59(e) motion, which is based solely on the same points and grounds stated in this Rule 52(b) motion, simply incorporates by reference the reasons and grounds stated herein. Plaintiff defers to the Court regarding deciding if anything it rules in response to this motion necessitates altering or amending the judgment in any way.

## INTRODUCTION

After four days of trial, on Friday, July 17, 2026, the Court provided its findings through an oral ruling and entered judgment in favor of the Defendant on all claims. (Dkt. 127.) The Court's decision contained findings regarding the four main categories of issues underlying Plaintiff's claims as presented at trial: (1) financial issues, including undisclosed overage prebilling practices; (2) omission of material facts regarding PLDG's relationship with UnitedHealth Group, Inc. ("UHG") prior to closing; (3) failure to disclose material facts regarding substantial gifts made to employees and the potential tax implications of the same; and (4) failure to provide, and destruction of, a complete set of company records. (Id.)

Plaintiff respectfully submits that some of the Court's findings should be amended, supplemented, or clarified to ensure that the full factual basis and record for the Court's final decision and judgment are clear.

## LEGAL STANDARD

Federal Rule of Civil Procedure 52(b) provides that, on a motion filed no later than 28 days after entry of judgment, the Court may amend its filings or make additional findings or clarify its findings. Doing so is appropriate where additional or amended findings and/or clarifications of certain findings would help clarify the factual and legal basis for the Court's ultimate decision. Plaintiff respectfully asks that the Court consider amending. Supplementing and/or clarifying its findings where it deems appropriate based on the issues identified below. Given that the entry of judgment was on July 17, 2026, this motion is timely as it is being filed prior to the expiration of 28 days after the judgment was entered.

## I. FINDINGS REGARDING FINANCIAL/PREBILL MANIPULATION.

### A. The Court's Finding that Recognition of the "Overage" Prebill Revenue was an Accepted Practice.

In its decision, the Court described the issue of overage prebills as "really complicated." (7/17/26 Trial Transcript, p. 15; Dkt. 127.) Having initially compared the practice to retainers taken by law firms for their clients, the Court explained that by the time of issuing its decision, it believed there was a "world of difference" between the two, stating "it's a little bit different than just paying for something in advance." (Id.) The Court concluded that "it seems to me, from the evidence that was presented in this case, that the money on the prebill was paid by the client with no expectation that it would ever get that money back." (Id., p. 16.) The Court relied on Nikki Cron's testimony that for smaller amounts, PLDG retaining the overage as revenue would be "business as usual." (Id., p. 18.) And as to the much larger amounts of overage, the Court referenced that Ms. Cron's testimony was not an unequivocal "of course it would be inappropriate to harvest that credit," instead her answer was "I'd really need to know more about it." (Id.) In the end, the Court found that "it seemed clear" that "the client had surrendered the money to the agency" in these overage situations. (Id., p. 22.)

Plaintiff respectfully requests that the Court amend, add to, or clarify its findings on this issue, and explain whether and to what extent it considered the testimony of other third-party witnesses besides Ms. Cron regarding the propriety of PLDG retaining and recognizing large amounts of prebill overage revenue without notifying its clients.

During the trial, the testimony of Rob Hagemann, who also worked for UHG, was introduced during the cross-examination of Sandy Gangelhoff regarding the prebill overage issue. When Mr. Hagemann was deposed, he was asked about a hypothetical situation where there was a $100,000 prebill project paid for by the client, and the agency only completed $30,000 worth of work. (Hagemann Dep. Transcript, pp. 49-51; Dkt. 80.) When asked what his understanding was of what should happen with the remaining $70,000, Mr. Hagemann testified "I would say the work would need to be completed or funds – ***or money refunded***." (Id., pp. 50-51.) (Emphasis added.) He was then asked "from your understanding and experience, was there ever a time where it would be appropriate for an agency to just keep that extra money without doing more work?" Mr. Hagemann answered: "I don't see that as being an appropriate situation." (Id., p. 51.) He was then asked, "If you on the UHC side found out that one of your agencies had done that, would you believe that was appropriate?" Mr. Hagemann's unequivocal answer: "**No**." (Id.) (Emphasis added.) When confronted with this testimony during trial, Ms. Gangelhoff did not contradict Mr. Hagemann's testimony as untruthful or inaccurate.

Defendant's accountant, Jason Marvin, was asked during his deposition if anyone had asked him to opine as to what GAAP would say about a scenario where $50,000 was prebilled and no work had been done towards earning that $50,000. (Marvin Dep. Transcript, p. 19; Dkt. 103.) Mr. Marvin confirmed he had not been asked by Defendant to give an opinion on that. (Id.) When asked by Plaintiff's counsel if he had any opinion on that situation under GAAP, Mr. Marvin confirmed that the

general rule is "if you've prebilled and know in the title of the goods and services . . . have not been provided and control has not been given over, ***you would not recognize that as revenue***." (Id.) (Emphasis added.)

Plaintiff respectfully asks the Court to amend, add to, or clarify its findings to address whether the Court considered the testimony of Mr. Hagemann especially, but also of Mr. Marvin, and clarify what weight, if any, was given to their testimony in reaching its findings regarding the treatment of overage prebills.

### B. The Court's Finding that Section 3.5 of the Stock Purchase Agreement Covered the "Overage" Prebills.

In its decision, the Court found that its reading of the Stock Purchase Agreement ("SPA") is that it would "cover even the prebilled amounts for work that was not performed," as the Court described the statement in the SPA as "pretty sweeping about 'we're going to agree to disagree on the handling of these prebillings.'" (7/17/26 Trial Transcript, p. 21; Dkt. 127.)

The provision the Court was referring to is Section 3.5 of the SPA. (Tr. Ex. 94.) That provision was testified to by many witnesses during the trial. No one testified that the parties intended to cover the "overage" prebills through that language. To the contrary, one of the few things all witnesses who testified from both sides in this case agreed on was that this language was intended to cover the prebills for which there was a dispute about the *timing* of the recognition of revenue, *not* about whether revenue could be recognized at all because the work had not been done. Both Ms. Rahn and Chris Wagner testified at trial they never would have agreed to that, and they had no idea that was happening in the first place, so it was never a

consideration when negotiating this language. Instead, the testimony and evidence at trial confirmed this language arose because the parties were actively fighting about whether prior period adjustments should be made to recognize revenue in years where the actual work on these prebill projects was done; not to decide whether or not revenue could be recognized at all where work was not performed.

Plaintiff respectfully asks the Court to amend, add to, or clarify its ruling in this respect, including referencing what testimony it was relying on in ruling that Section 3.5 would cover the "overage" prebills, and whether and to what extent that conclusion ultimately factored into its final decision to deny Plaintiff's claims.

### C. The Court's Finding that had Sara Rahn Known About the "Overage" Prebill Issue she still would have Closed on the Deal.

In its decision, the Court found that, while it did not question the sincerity of Ms. Rahn's trial testimony that she would not have gone through with the purchase of PLDG had she known the full truth, it analogized the situation to a criminal defendant who later seeks to withdraw their guilty plea. (7/17/26 Trial Transcript, pp. 23-24; Dkt. 127.) The Court explained it must judge not what the person says at the time [meaning after the fact] "but whether it's an accurate reflection of what would have happened at a previous time under different circumstances." (Id., p. 23.) The Court went on to explain its reasoning based on the negotiations of the final purchase price, ultimately concluding that "I think the evidence suggests that it would not have made a difference. That if it had been fully disclosed, it would have been more [or] less of a piece of the prebilling accounting dispute that the parties had and agreed to the sale despite their differences in how

the accounting was done, because I think, fundamentally, that's what these – the prebilling of the overages was." (Id., pp. 24-25.)

Under Delaware law, the justifiable reliance element of fraudulent inducement requires showing that the misrepresentation or omission concerned "a matter which a reasonable person would consider important in determining his choice of action in the transaction in question." *Lock v. Schreppler*, 426 A.2d 856, 863 (Del. Sup. 1981) (reversed on other, unrelated grounds) (internal citation omitted). It "is not required that a reasonable person would make a choice solely upon the basis of that matter." *Id.* In other words, the "defendant's misrepresentations need not be the sole cause of the plaintiffs' damage, merely a substantial factor in inducing the plaintiffs to act." *Id.*

Plaintiff believes evidence was presented at trial to support a finding of justifiable reliance based on an objective, reasonable-buyer standard. For example, Ms. Cron admitted it was concerning to her to see internal PLDG communications discussing taking in "overage" as profit on a job where it had not done any work without telling her and just "risking" that she might ask about it down the road.

Q: Okay. **Does it concern you in one of the options they're internally considering to close the job, take the overage and risk that you ask about it down the road?**...

A: **Yes.**

* * *

Q: Reading these e-mails, would you agree that this is something you would have expected the folks at PLDG to come bring to your attention? . . .

A: **Yes.**

(Id., pp. 42-43, 49-50.) (Emphasis added.)

The testimony quoted above from Mr. Hagemann and Mr. Marvin supports this point as well. (See *supra*, pp. 4-5.) Ms. Rahn's broker, Chris Wagner, testified at trial that he would have advised Ms. Rahn to walk away from the deal entirely if this "overage" prebilling practice had been disclosed during due diligence. So there was other evidence presented from which the Court could have determined this information would have been material to a reasonable buyer in Ms. Rahn's position. And Ms. Rahn's testimony, while given with the benefit of hindsight, was sincere and truthful that this would have been material to her.

Plaintiff respectfully requests that the Court amend, add to, or clarify its findings as to the reliance element, to explain whether the Court's ruling on this issue was based solely on a subjective assessment of Ms. Rahn's testimony, or based on an objective reasonable-buyer standard, or both.

### D. The Court's Finding that There was No Evidence of Intent to Conceal the Prebill Overage Issue from Plaintiff.

In its decision, the Court held that the seller's concealment of the prebill overage issue was not done with "intent to defraud." (7/17/26 Trial Transcript, p. 20; Dkt. 127.) But evidence was introduced at trial that Plaintiff believes bears on the intent issue.

Specifically, evidence was introduced showing that when Plaintiff asked for proof that work on certain jobs for which prebill revenue had been recognized had actually been completed by PLDG, Plaintiff received cut-off snapshots of headings from reports generated from PLDG's internal system, Clients & Profits ("C&P"). (Tr.

Ex. 73.) The snapshots showed the jobs as "closed" and "finished," but the full reports, which were never disclosed to Ms. Rahn, indicate that there was a massive amount of time for which the client had been billed, but which was never actually worked off by PLDG on these jobs. (Tr. Ex. 74.) The Court will recall not only the bottom portions of the full reports showing details on the time and fees worked on these projects being cut off in the screenshots sent to Plaintiff, but also the side of the headers which showed pie charts illustrating how little work had been done on these projects were cut off. Defendant could not explain at trial why the full reports (which Ms. Rahn did not have access to prior to the closing) were not provided in response to Plaintiff's request, or why the cut-off screenshots were sent instead.

Plaintiff respectfully requests that the Court amend, add to, or clarify whether it considered this specific evidence in reaching its findings on intent and, if so, what weight it gave to this evidence.

### E. Clarification Regarding Court's Ruling Should any Client in the Future make a Claim for Overage Prebill Funds.

In its decision, the Court referenced that, to date, no client had come back and made a claim for any overage funds PLDG had retained under Ms. Lauritsen's ownership. (7/17/26 Trial Transcript, p. 19; Dkt. 127.) But that leaves open the question of what happens if any client[3] comes back and asks for an audit of PLDG's prebill work and/or for reimbursement of "overage" revenue.

---

[3] Notably, while a large focus of the trial, even on prebill issues, was on UHG, there are other clients for whom this applies besides UHG, as evidenced on the "Free Money Spreadsheet" and other evidence submitted at trial.

The SPA provides indemnification protection for this scenario. (See SPA Article VII; Tr. Ex. 94.) But the Court's decision is unclear on whether that provision remains enforceable moving forward and is unimpacted by the Court's other findings. This is an important clarification because Ms. Rahn still owns the company as rescission was obviously not ordered at the end of trial, and so any future liability for these overages should any clients disagree with this Court's findings that the money was rightfully taken in as revenue by PLDG remains with the company and with Ms. Rahn. This is also important for Ms. Rahn's lending relationship and making sure proper risks and potential liabilities are fully disclosed and understood.

Plaintiff therefore respectfully requests that the Court clarify the impact of its decision on forward-looking potential liabilities for these "overage" prebill issues should they arise in the future.

### F. Other Financial Issues not Addressed in the Court's Decision.

Finally, while a heavy focus at trial was on the overage prebill revenue, Plaintiff asserted that Defendant engaged in other financial manipulations, including with respect to its undisclosed timing of booking, off-book tracking, and amortization of certain expenses, all of which Ms. Rahn testified about at trial.

In its decision, the Court focused its findings on the financial claims by Plaintiff on the prebill analysis. Plaintiff respectfully requests that the Court amend, add to, or clarify its findings to confirm that it considered the evidence and testimony Plaintiff presented regarding other financial manipulation (including booking and amortization of expenses) and, to the extent it did not, that it would not change or impact its ultimate decision.

## II. FINDINGS REGARDING UNITEDHEALTH GROUP, INC. ("UHG").

Regarding Plaintiff's claims pertaining to UHG, the Court engaged in an extensive analysis of the various contractual representations Plaintiff asserted that it believed Defendant breached in this respect. (7/17/26 Trial Transcript, pp. 6-10; Dkt. 127.) As to fraudulent inducement on this issue, the Court stated that "an omission is actionable if there's a duty to disclose in order to prevent statements actually made from being a misrepresentation," and then held that no statements were really identified at trial that were made misleading by the omission of the Nikki Cron email. (Id., p. 10.)

The Court then went on to explain that it found the testimony at trial compelling that changes Ms. Rahn made to the business after the purchase caused PLDG to be in a bad position to be able to keep the UHG business, and that was the cause of the loss, as opposed to it having anything to do with Defendant's lack of disclosure regarding the issues Nikki Cron raised in her email two days before the closing. (Id., pp. 11-14.) Specifically, the Court stated that "as Nikki Cron testified, in her deposition, she just didn't have any of the people that she was used to working with working there anymore." (Id., p. 14.) And she "counted on people who knew well all of the details of the complicated brand standards" of UHG and "the new employees that were brought in just didn't have the facility to produce work that met the standards that Nikki Cron expected." (Id.)

Plaintiff asks the Court to consider amending, supplementing and/or further clarifying its findings pertaining to the fraudulent inducement claim as to UHG in two ways.

### A. The Fraudulent Inducement Standard Under Delaware Law.

Under Delaware law, fraudulent inducement may be based not only on affirmative misrepresentations, but also on deliberate concealment of material facts or silence where there is a duty to speak. *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144. (Del. Ch. 2003). Scienter may be proven by showing a defendant acted knowingly, intentionally, or with reckless indifference to the truth. *Vichi v. Koninklijke Philips Elecs. N.V.*, 85 A.3d 725, 810 (Del. Ch. 2014); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 154 (Del. Ch. 2004). The reliance element requires facts making it <u>reasonably conceivable</u> that a plaintiff was exposed to the misrepresentation or omission and acted, or refrained from acting, based on it. *Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 465 (Del. Ch. 2024); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 325 (Del. Ch. 2013); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 29 (Del. Ch. 2009).

In its decision, the Court noted the lack of any specific statement it believed was made misleading as a result of the concealment of the issues Nikki Cron raised prior to the closing by Defendant. Plaintiff belives it did identify such statements at trial, but does not seek to re-litigate that issue on this motion. Rather, Plaintiff asks the Court to clarify its ruling in light of the fact that the formal elements of fraudulent inducement under Delaware law do not require a plaintiff to necessarily identify specific affirmative statements.

The *H-M Wexford LLC* court held "[i]n addition to overt representations, fraud may also occur through deliberate concealment of material facts, or by the silence in the face of a duty to speak." 832 A.2d at 144. Earlier Delaware decisions

confirm this principle, which courts describe generally as the concept of "fraudulent concealment." *See Schreppler*, 426 A.2d at 860-61 (finding that "one party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.") (quoting Restatement of Torts, Second, § 550); *Leech v. Husbands*, 152 A. 729, 731-32 (Del. Sup. 1930) (concluding that the failure to disclose known material facts can constitute fraud where there was an intent to deceive the other party and induce them to act to their detriment).

In other words, if Defendant deliberately concealed material facts in order to induce Plaintiff to act, and the evidence shows it is "reasonably conceivable" that Plaintiff did, in fact, act to its detriment as a result of the concealment, then the elements of fraudulent inducement may be satisfied under Delaware law.

Plaintiff respectfully requests the Court amend, add to, or clarify its findings to confirm that it does not believe the elements of fraudulent inducement were met under Delaware law even if the standard does not require identificaiton of specific affirmative misrepesentations or misleading statements.

### B. Weight Given to Nikki Cron Testimony Regarding Employee Departures from Before the Closing.

As noted above, the Court based its findings on this claim heavily on testimony regarding departures of employees *after* the closing under Ms. Rahn's leadership. (7/17/26 Trial Transcript, pp. 11-14; Dkt. 127.) But testimony was also introduced at trial regarding the problems Ms. Cron said she was experiencing from

the departure of PLDG employees from *before* the closing under Ms. Lauritsen's leadership and ownership.

The Court of course saw Nikki Cron's June 14, 2023 email numerous times throughout the trial, in which she said she was not getting the work or support from PLDG that she needed, and insisting that PLDG get back to "previous levels of service, talent and turnarounds." (Tr. Ex. 113.) When Ms. Cron testified about this June 14, 2023 communication and the issues addressed therein at her deposition, she explained how she had come to PLDG months before sending the email to explain she would need "dedicated team support" to execute strategy on some increased volume she was expecting, and that is what she was referring to in her June 14, 2023 email when she said that she had come to PLDG months ago with a "heads up" about needing better service. (Cron Dep Transcript, pp. 52-56; Dkt. 78.)

Ms. Cron explained that in the months that followed her initial "heads up" about needing better and faster work from PLDG, and up through June 14, 2023, she did not receive the level of work and support that she needed from PLDG:

Q: All right. And so then in the remainder of this first paragraph after you remind Sandy that you gave her a heads up about this, you say, "**Sadly, I am not getting [it] more than ever at all. I'm getting volume that is a bit slower and sloppier**"; right?

A: Uh-huh.

* * *

**Q: Okay. And so your experience between the time of that in-person meeting and June 14th, 2023, you were not getting the work and support of PLDG that you needed; right?**

**A: Yes.**

(Id., pp. 57-58.) (Emphasis added.)

Ms. Cron then confirmed that her threat to shift work away from PLDG if levels of "service, ***talent*** and turnarounds" did not improve, was based on "some team members [who] had left" and that Ms. Cron "needed them to be replaced."

> Q: Okay. And then the next paragraph says, "Please be aware that this is my current experience and I may **need to shift some work if PLDG can't commit to previous levels of service, talent, and turnarounds**. Please let me know if this is something that can be expected within the next week or so;" right?
>
> A: Uh-huh. Okay.
>
> Q: And you were being truthful when you said that to Ms. Gangelhoff; right?
>
> A: Yes.
>
> Q: This wasn't some bluff to kick them into gear, was it?
>
> A: It wasn't a bluff to kick them into gear. It was an acknowledgement that they had – **some team members had left, and that – and that I needed them to be replaced**.

(Id., pp. 59-60.) (Emphasis added.)

There was testimony at trial from multiple witnesses about a number of PLDG employees who left prior to the closing, some of whom had worked extensively with Ms. Cron on her projects. And Ms. Cron testified it was the work of the team in place in the months leading up to the closing to which she was referring in her June 14, 2023 email (which had to be the case since the closing hadn't occurred yet at that time), and that the announcement of Ms. Gangelhoff's departure later in 2023 was the "final straw." (Id., pp. 59-60, 72-73.)

In its decision, the Court focused on the impact of employees who left after closing, under Ms. Rahn's leadership, based on some business changes Ms. Rahn implemented. In Plaintiff's view, as Ms. Rahn testified at trial, it was the departure of employees and the replacement team from before the closing which caused Ms. Cron's dissatisfaction in the days and months leading up to closing, and that is what set the wheels in motion and, had Ms. Rahn been told about those issues, she would have been operating with all the material information and could have adjusted accordingly.[4] Plaintiff believes the concealment of that material information by the Defendant deprived Ms. Rahn of that opportunity and induced her to close the deal without the benefit of having the full picture regarding the fragility of the relationship with Ms. Cron and UHG just days before closing.

Plaintiff respectfully requests that the Court amend, add to, or clarify its findings to confirm whether, and to what extent, it considered testimony about the impact of employees who left *before* the closing in its ruling on this issue.

## III. FINDINGS REGARDING GIFTS PAID TO PLDG EMPLOYEES.

The Court found that there's no evidence that the company is exposed to any actual tax liability based on the gifts (some of which were disclosed, others not) made by Ms. Lauritsen to her PLDG employees. (7/17/26 Trial Transcript, p. 29; Dkt. 127.) The Court referenced Plaintiff's expert witness, Todd Clemens, and said his testimony "suggested that it would be a complicated decision from the IRS to decide

[4] Full disclosure by the seller regarding these facts also would have allowed Plaintiff to plan for the expense of replacing the people Ms. Cron was unsatisfied with on the team, which would have been important to her financial assessment of the deal.

whether any of the bonuses were actually – should have been treated as compensation." (Id.) The Court continued: "What is clear is there has never been any attempt by the IRS to come back and impose any liability." (Id.)

Plaintiff respectfully asks the Court to amend, add to, or clarify two discrete issues with respect to its findings on this issue.

First, Mr. Clemens testified that the treatment of these payments as gifts rather than deferred compensation violated Section 102(c) of the internal revenue code. Plaintiff asks the Court to confirm if its finding and ultimate ruling is that these payments *did not* violate Section 102(c).

Second, similar to the issue described above regarding potential future liabilities to clients for prebill overage revenue, because this purchase was structured as a stock sale, R&R maintains the liability for any improper classification resulting in due and owing taxes, along with any potential penalties and interest the IRS may impose. Those potential liabilities are covered by the SPA indemnification provisions. (See SPA Article VII; Tr. Ex. 94.) But the Court's decision is unclear on whether that provision remains enforceable moving forward and is unimpacted by the Court's other findings. This is an important clarification because Ms. Rahn still owns the company as rescission was not ordered, and so any future liability to the IRS based on Ms. Lauritsen's payments to employees remains with the company and with Ms. Rahn. This is also important for Ms. Rahn's lending relationship and making sure proper risks and potential liabilities are fully disclosed and understood.

Plaintiff therefore respectfully requests that the Court clarify the impact of its decision on forward-looking potential tax liability (including penalties and interest), which could be as simple as the Court confirming it did not rule on that as that would not have been ripe during this trial because the IRS has not pursued anything at this point, and so its decision has no legal impact on any future claims based on future taxes, penalties or interest the IRS may seek to impose.

## IV. FINDINGS REGARDING DELETION OF COMPANY RECORDS.

In the Court's decision regarding the deletion of company records, the Court found that Section 3.21 (regarding "books and records") of the SPA does not specifically reference emails, and so "it's not clear to me at all that even if the – emails had been completely deleted and unrecovered – that it would be a breach of the stock purchase agreement." (7/17/26 Trial Transcript, p. 30; Dkt. 127.) The Court referenced Mr. Wagner's testimony that all of the emails should have been turned over, but said that's not really his "expertise," and it's "really a legal conclusion."

Under Delaware law, because the structure of this deal was a stock purchase (as opposed to an asset purchase), *all* assets, including all records and emails, were to be preserved and transferred to the buyer as the new owner of PLDG. *See Great Hill Equity Partners IV, LP, et al. v. SIG Growth Equity Fund I, LLLP, et al.*, 80 A.3d 155, 160-162 (Del: Court of Chancery 2013) (finding that even attorney-client privileged emails became the property of the acquiring company because the parties did not negotiate a carve-out, as they could have). In other words, under Delaware law, the burden does not fall on Plaintiff to prove that the SPA's provision about books and records expressly includes emails, that is the presumption. The

burden would have been on the Defendant/seller to negotiate to expressly *exclude* emails (or even certain types of emails, like privileged communications) from the deal if she did not want to preserve and turn those over.

Plaintiff respectfully requests that the Court amend, add to, or clarify its ruling on this issue that Defendant was not obligated to turn over all records, including all emails of PLDG, in connection with this transaction under applicable Delaware law.

WHEREFORE, Plaintiff R&R respectfully requests that the Court enter an order amending, adding to, and/or clarifying any findings of fact or conclusions of law it deems appropriate based on this motion. To the extent any such amendments, additions or clarifications are ordered and impact the final judgment, Plaintiff respectfully requests that the Court grant Plaintiff's concurrently filed motion to alter or amend the judgement pursuant to Federal Rule of Civil Procedure 59(e) so as to give effect to any changes, additions or clarifications in the findings the Court orders.

Dated this 13th day of August, 2026.

Respectfully submitted,

KRAVIT, HOVEL & KRAWCZYK S.C.

*s/Aaron H. Aizenberg*
Aaron H. Aizenberg
State Bar No. 1066340
Benjamin J. Glicksman
State Bar No. 1086852
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (phone)
aha@kravitlaw.com
*Attorneys for Plaintiff*