UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

R&R MEDIA GROUP, LLC

Plaintiff,

Case No. 24-cv-00856

PEGGY LAURITSEN,

Defendant.

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR ATTORNEYS' FEES**

---

Fed. R. Civ. P. 37(c)(2) is not a prevailing party fee-shifting statute. It is a narrow sanctions provision designed to address a party's failure to admit matters requested under Rule 36 where the responding party had no reasonable grounds to believe it might prevail on the issue it denied.

Defendant's Rule 37(c)(2) motion fails for three reasons. First, Plaintiff had reasonable grounds to believe it might prevail on the issues at trial. Defendant's motion focuses entirely on partial deposition testimony from Nikki Cron and Rob Hagemann. And while some of Cron's and Hagemann's testimony supported Defendant, other portions of their (and others') testimony supported R&R, as did other contemporaneous communications, business records, and competing inferences. The UHG claim was not summarily dismissed. Those contested disputes required resolution via bench trial, during which extensive evidence and testimony was presented. Rule 37(c)(2) does not sanction R&R for declining to concede genuinely disputed matters that ultimately required resolution by the factfinder.

If the Court finds R&R had reasonable grounds based on all the evidence to believe it *might* prevail at trial on the issues it was asked to admit, then Defendant's motion should be denied without further analysis. But there are also two other independent reasons for which Defendant's motion would have to be denied even if the Court did consider it beyond the question of the reasonableness of Plaintiff's belief that it might prevail at trial.

As a threshold matter, a number of Defendant's RFAs as framed were not actually proven at trial, rendering them ineligible for Rule 37(c)(2) relief. In addition, Defendant's fee calculation suffers from a separate problem. Rule 37(c)(2) permits only expenses caused by the need to prove matters that should have been admitted, but Defendant equates the cost of proving the denied RFAs with the cost of litigating the UHG claim in full. She then allocates broad categories of pretrial preparation and trial expenses to the RFA denials even though much of that work would have been necessary regardless of the responses. That conflation fails Rule 37(c)(2)'s required causal nexus: the question is not how much of the litigation concerned UHG, but rather *what specific expenses Defendant would have avoided had the particular matters been admitted*. Defendant has not made that showing, which is another independent reason her motion should be denied.

## STATEMENT OF RELEVANT FACTS

R&R brought this action based on its June 16, 2023 purchase of Peggy Lauritsen Design Group, Inc. ("PLDG") from Defendant Peggy Lauritsen pursuant to a Stock Purchase Agreement ("SPA"). (Dkt. 2 ¶¶ 24, 28.) One claim R&R alleged was that Defendant failed to disclose material facts concerning problems with PLDG's

relationship with its largest customer, UnitedHealth Group ("UHG"). (*Id.* ¶¶ 31–53, 109–18.) The UHG claim (along with other claims R&R asserted) proceeded to a five-day bench trial.

### A. The Evidence Available when R&R Answered the RFAs Supported a Genuine Dispute Concerning UHG.

The evidence in the record showed that on June 14, 2023, two days before the closing, Nikki Cron of UHG wrote an email to PLDG to say that she had expressed months earlier that she needed more work and support out of PLDG than she was getting, and that as of June 14, 2023, "sadly, I am not getting it more than ever at all." (Tr. Ex. 113.) She called PLDG's recent work slow and sloppy and said if PLDG can't get back to "previous levels of service, talent and turnarounds" then she would have to consider shifting work away from PLDG. (*Id.*)

When Ms. Cron testified at her deposition about this June 14, 2023 communication and the issues addressed therein, she confirmed that her email was genuine and that if PLDG's performance did not improve, she would consider shifting some work away to another vendor. (Dkt. 78, Cron Dep. pp. 58-64.) She further testified about how she had come to PLDG months before sending the email to explain she would need "dedicated team support" to execute strategy on some increased volume she was expecting, and that is what she was referring to in her email when she said that she had come to PLDG months ago with a "heads up" about needing better service. (*Id.*, pp. 52-56.)

Ms. Cron explained that in the months that followed her initial "heads up" about needing better and faster work from PLDG, and up through June 14, 2023,

she did not receive the level of work and support that she needed from PLDG:

> All right. And so then in the remainder of this first paragraph after you remind Sandy that you gave her a heads up about this, you say, "**Sadly, I am not getting [it] more than ever at all. I'm getting volume that is a bit slower and sloppier**"; right?
>
> A: Uh-huh.
>
> * * *
>
> **Q: Okay. And so your experience between the time of that in-person meeting and June 14th, 2023, you were not getting the work and support of PLDG that you needed; right?**
>
> **A: Yes.**

(*Id*., pp. 57-58.) (Emphasis added.)

Ms. Cron also confirmed that her threat to shift work away from PLDG was not a bluff, and that her statement regarding needing the level of "service, talent and turnarounds" to improve was based on "some team members [who] had left" and that Ms. Cron "needed them to be replaced."

> Q: Okay. And then the next paragraph says, "Please be aware that this is my current experience and I may **need to shift some work if PLDG can't commit to previous levels of service, talent, and turnarounds**. Please let me know if this is something that can be expected within the next week or so;" right?
>
> A: Uh-huh. Okay.
>
> Q: And you were being truthful when you said that to Ms. Gangelhoff; right?
>
> A: Yes.
>
> Q: This wasn't some bluff to kick them into gear, was it?
>
> A: It wasn't a bluff to kick them into gear. It was an acknowledgement that they had – **some team members had left, and that – and that I needed them to be replaced**.

(*Id.*, pp. 59-60.) (Emphasis added.) Ms. Cron then explained that the announcement of Ms. Gangelhoff's departure later in 2023, after Ms. Rahn had purchased PLDG, was the "final straw" for her. (*Id.*, pp. 72-73.)

In its decision at the end of trial, the Court relied on testimony from employees who left PLDG after closing, under Ms. Rahn's leadership, regarding some business changes Ms. Rahn implemented. (Dkt. 127, 7/17/26 Trial Transcript, pp. 6-10.) The Court explained that it found the trial testimony compelling that changes Ms. Rahn made to the business after the purchase caused PLDG to be in a bad position to be able to keep the UHG business, and that was the primary cause of the loss, as opposed to it being caused by Defendant's lack of disclosure regarding the issues Nikki Cron raised in her June 14, 2023 email. (*Id.*, pp. 11-14.)

At the time R&R responded to the requests for admission, it was Ms. Rahn's genuine belief, as she testified at trial, that it was the departure of employees and the replacement team from *before* the closing which caused Ms. Cron's initial dissatisfaction, and that is what set the wheels in motion for the ultimate loss of the UHG business. She also believed and testified at trial that had she been told about those issues, she would have handled things differently, as she would have been operating with all the material information as it pertained to the UHG relationship. R&R had reasonable grounds to believe, even in light of Ms. Cron's deposition testimony, that it might prevail on the issue at trial.

In pre-trial motions *in limine*, Defendant sought to exclude a number of pieces of evidence related to the UHG claim. (Dkt. 64.) This included, among other

things, Sandy Gangelhoff's 2023 sales plan, in which she described UHG representative Rob Hagemann as a "threat" because he wanted to "shake things up" and noted that he was a "demanding client." (Dkt. 80-1 at p. 2.) Defendant also sought to exclude Nikki Cron's June 14, 2023 email itself, arguing it was hearsay. (Dkt. 64.) In addition to ruling these documents did not constitute hearsay, in its decision, the Court explained that "R&R Media doesn't need to show that UnitedHealth Group was in fact dissatisfied; what matters is whether Lauritsen and the other PLDG employees believed that UnitedHealth Group was dissatisfied at the time of the sale." (Dkt. 110 at pp. 8-9.) R&R certainly had reasonable grounds to believe it might prevail at trial in demonstrating that Lauritsen and other PLDG employees believed UHG was dissatisfied with PLDG's service at the time of the closing on the sale. Nothing Ms. Cron or Mr. Hagemann said in their depositions foreclosed that finding, which is part of why the claim proceeded to trial.

Ms. Cron's and Mr. Hagemann's testimony also cannot be considered in a vacuum, as it did not erase the evidence concerning the condition of the UHG relationship at the time of the closing. For example, even though Mr. Hagemann characterized the 2022 review as "business per usual" and testified that his team was not then contemplating terminating PLDG's business, that testimony was considered by R&R alongside Cron's contemporaneous warning, PLDG's internal sales materials identifying Hagemann as a "threat," and PLDG's urgent response to Cron's complaint immediately before closing. (Dkt. 80, Hagemann Dep. 19:3–28:2, 69:19–71:5, 72:9–17, 74:11–24.) Even the statement about which Ms. Rahn testified at her deposition that

Mr. Hagemann told her in a December 2023 meeting that UHG had been having problems with PLDG's performance for at least a year—a statement the Court excluded from trial as hearsay—has to be considered as proper context for Ms. Rahn's denials of the requests for admission. Mr. Hagemann himself testified that he wouldn't be surprised if he had said that, and Ms. Rahn did not know at the time R&R responded to the requests that the Court would exclude that testimony, so it is part of what formed her reasonable belief that she might prevail.

The record confirms that when R&R responded to Defendant's Requests for Admission on May 19, 2026, there was ***competing evidence***—not an undisputed record—regarding the UHG claim. The evidence presented disputed questions concerning the significance of UHG's dissatisfaction at closing, Lauritsen's belief regarding UHG's dissatisfaction, whether Cron's warning created a material risk to PLDG's business, whether those circumstances triggered the SPA's disclosure provisions, and the relationship, if any, between the pre-closing problems and UHG's departure. The fact that the Court interpreted the contractual provisions and made findings of fact which led it to ultimately resolve those contested issues and the UHG claim against R&R does not trigger sanctions under Rule 37(c)(2).

### B. R&R Denied or Qualified Defendant's Requests for Admission Based on the Disputed/Contested Issues.

Defendant's requests for admission did not merely seek admissions of discrete historical facts. Rather, several requests asked R&R to concede broad factual, legal and contractual issues on which its UHG claims depended. (Dkt. 130, Exs. C–D.) R&R denied or qualified these requests based on the evidentiary record developed

in discovery. In particular, R&R denied requests concerning UHG's pre-closing dissatisfaction and the risk to PLDG's UHG business based on the evidence described above, while objecting to requests that required R&R to adopt Defendant's legal positions and interpretation of the SPA. (Dkt. 130, Ex. D, Resp. Nos. 1–5, 12–13.)

R&R's responses also demonstrate that it did not reflexively deny every request for admission. In response to Request No. 8, for example, R&R admitted Cron's testimony that the departure of two PLDG employees in December 2023 was the "final straw" that led her to pull work, while declining to admit Defendant's broader characterization/conclusion that those departures *alone* caused the loss of UHG's business. (*Id.*, Resp. No. 8.) Similarly, in response to Request No. 15, R&R admitted that UHG was properly identified as a material customer, while denying the request to the extent it sought the broader conclusion that Defendant had not misrepresented or failed to disclose *any* material circumstances concerning UHG at the time of closing. (*Id.*, Resp. No. 15.)

R&R's responses were not sanctionable at the time they were served, and they do not become sanctionable now merely because the UHG claim was denied by the Court after a five-day trial.

### C. The Court Resolved Disputed Issues of Fact and Law Regarding the UHG Claim at Trial.

The UHG issues proceeded to trial along with R&R's other claims. The claim was not dismissed on summary judgment. Nor was the claim excluded based on any of the motions *in limine* Defendant brought before trial. The parties presented substantial deposition testimony, examined numerous live witnesses, and introduced

dozens of exhibits concerning UHG, PLDG's employees, and the circumstances surrounding the ultimate loss of UHG's business, along with arguing about the interpretation of relevant SPA provisions. (Dkt. 127.)

After hearing all the evidence, the Court ultimately denied the UHG claim. But the Court did not find that Cron's pre-closing concerns were fictitious or unsupported. To the contrary, the Court found that Cron was "somewhat dissatisfied," that her complaint was "sincere," and that PLDG took it "very seriously." (*Id*. at 7:2–13.) While the Court ultimately concluded Cron's complaint did not represent a "crisis" and did not rise to the level of materiality required by the SPA or Delaware common law, those findings do not mean that R&R lacked a reasonable basis two months before trial to believe it might prevail. (*Id*. at 7:14–8:2.)

## ARGUMENT

Defendant's motion fails at each step required by Rule 37(c)(2). <u>First</u>, Defendant has not established that R&R did not have any reasonable grounds to believe it might prevail on the UHG claim. <u>Second</u>, Defendant has failed to show that she proved all the denied requests as framed. <u>Third</u>, Defendant has not shown that the $53,905.02 she seeks was "incurred in making" the particular proof necessitated by R&R's denials, rather than in litigating the UHG claims more broadly. Each provides an independent basis to deny the motion.

### I. R&R HAD REASONABLE GROUNDS TO BELIEVE IT MIGHT PREVAIL.

Even where a requesting party ultimately proves a matter to be true, expenses may not be awarded if any of Rule 37(c)(2)'s four exceptions applies. Fed. R. Civ. P. 37(c)(2). Defendant summarily asserts that "[n]one of the exceptions apply

here." (Dkt. 131 at 18.) But that is not so. Rule 37 expressly precludes an award where "the party failing to admit had a reasonable ground to believe that it might prevail on the matter." Fed. R. Civ. P. 37(c)(2)(C). The Seventh Circuit has held that "[t]he true test under Rule 37(c) is not whether a party prevailed at trial but whether he acted reasonably in believing that he ***might*** prevail." *United States v. Pecore*, 664 F.3d 1125, 1136-37 (7th Cir. 2011) (quoting Fed. R. Civ. P. 37 advisory committee's note to 1970 amendment) (emphasis added). The record contained competing—and at times contradictory—evidence here. R&R therefore had reasonable grounds to believe that it might prevail on the matters it declined to admit.

Defendant argues that, because Cron and Hagemann had already been deposed and "firmly rejected R&R's theories," R&R "could not have a reasonable ground for its denials." (Dkt. 131 at 19.) But that analysis focuses only on the portions of the May 2026 record favorable to Defendant. Other evidence in the record supported R&R's position and provided a reasonable basis on which to decline the requested admissions. The Rule 37(c)(2)(C) inquiry is whether R&R, when it answered the RFAs in May 2026, had reasonable grounds to believe it might prevail on the matters it declined to admit. It did.

### A. The May 2026 Record Provided Reasonable Grounds for R&R's Responses to the Challenged RFAs.

Of the 13 RFAs at issue, some asked R&R to broadly characterize the significance of certain historical facts, several incorporated disputed terms from the SPA, and still others asked R&R to accept Defendant's theory of causation or concede the absence of breach altogether. R&R's responses to the requests were not blanket

denials: rather, R&R admitted or qualified propositions where appropriate, and denied others based on the available evidence. Considered individually, each of R&R's responses had a reasonable basis.

**Request No. 1** — Defendant asked R&R to admit that UHG had not been dissatisfied with PLDG's services or work product for at least a year before June 16, 2023. R&R denied that proposition based on evidence predating Cron's June 2023 email, including PLDG sales materials identifying Hagemann as a "threat," descriptions of Hagemann as demanding, Hagemann's testimony concerning earlier performance problems, and Rahn's recollection concerning Hagemann's communication that problems had existed with PLDG's performance for more than a year. That evidence provided R&R with a factual basis not to concede the categorical proposition that no such dissatisfaction existed.

**Request No. 2** — Risk of losing UHG. The record supplied strong grounds for R&R to deny that PLDG was not at risk of losing UHG as of closing. Approximately 36 hours before closing, Cron described PLDG's recent work as "slow and sloppy," said concerns had existed for "months," and warned that unless PLDG returned to its "previous levels of service, talent and turnarounds," she might have to shift work elsewhere. (Dkt. 78, Cron Dep. 52–63 & Ex. 51.) At her deposition, Cron confirmed that PLDG's work had become "slower and sloppier," that work might go to another vendor absent improvement, and that her warning was genuine—not a bluff. (*Id.* at 58:5–12, 59:23–60:18, 62:6–23, 64:10–18.) PLDG itself treated the situation as "incredibly concerning" and implemented unusual remedial measures

directed specifically at Cron's work. (Dkt. 81, Gangelhoff Dep. 32:3–33:4, 51:3–60:8.) Whatever conclusion ultimately followed from that evidence, it supplied an objective basis for R&R not to admit that there was no risk of losing UHG.

**Request No. 3** — "Material dispute." Defendant asked R&R to admit that UHG did not have a "material dispute" with PLDG as of closing. R&R objected that "material dispute" required legal interpretation and application of the SPA and denied the request based on the evidence concerning Cron's genuine dissatisfaction, her threat to shift work, and PLDG's response. (Dkt. 130, Ex. D, Resp. No. 3.) Whether those circumstances constituted a "material dispute" under § 3.19(a) was not a discrete historical fact that Cron or Hagemann could conclusively establish by testimony; it required legally interpreting the SPA and applying that interpretation to the underlying facts. R&R had a reasonable basis to maintain its interpretation and application rather than concede Defendant's prior to trial.

**Request No. 4** — A clear and material threat to UHG business. R&R likewise reasonably denied that there was no "clear and material threat" to PLDG's UHG business. Cron had expressly warned that work might be shifted absent prompt improvement and confirmed that the warning was genuine. (Dkt. 78, Cron Dep. 59:23–60:18.) Gangelhoff called the situation "incredibly concerning," and PLDG responded by escalating Cron's work, assigning senior review, adding staff resources, and dedicating Fox to the account. (Dkt. 81, Gangelhoff Dep. 31:4–33:4, 51:3–60:8.) That contemporaneous evidence supplied reasonable grounds for R&R to dispute Defendant's characterization that no clear and material threat existed.

**Request No. 5** — UHG's preferred-vendor status. Defendant asked R&R to admit that UHG did not intend to remove PLDG from its preferred-vendor list as of closing. R&R denied the request based on the same contemporaneous evidence described herein: UHG had threatened to shift business because of performance problems; the warning was escalated within PLDG to senior leadership; and PLDG treated the ensuing situation as serious. These facts, coupled with the undisclosed information from Rob Hagemann, caused R&R to reasonably believe the circumstances created a risk to PLDG's continuing status with UHG and therefore had a basis not to make the requested admission.

**Request No. 6** — Concealment of a material dispute. Request No. 6 went beyond historical facts and asked R&R to concede that Defendant had not concealed any material dispute between PLDG and UHG. R&R maintained that the undisclosed Cron communication and related pre-closing circumstances constituted a material dispute that should have been disclosed. Because R&R had a reasonable factual and contractual basis under Delaware law for disputing whether a "material dispute" existed, it likewise had a reasonable basis not to concede the derivative proposition that Defendant had concealed none.

**Request No. 8** — Employee departures as the cause of Cron's December 2023 decision. R&R did not deny Cron's testimony that the departure of two PLDG employees was the "final straw" leading her to pull work in December 2023. Rather, it declined to admit Defendant's broader proposition that those two departures were the singular reason for the loss of UHG business or that pre-closing problems played

no role. (Dkt. 130, Ex. D, Resp. No. 8.) That qualification had a reasonable basis. A "final straw" identifies an immediate trigger; it does not necessarily establish that no antecedent condition contributed to the result. And the record contained evidence of performance concerns dating back "months," Cron's pre-closing threat to shift work based on the departure of other key employees from before the closing, and PLDG's extraordinary response. R&R's contention was that the lack of disclosure by Defendant fraudulently induced her to close on the sale, and R&R reasonably believed it might prevail on that issue, and therefore had reasonable grounds to decline Defendant's broader causal inference even in light of Cron's testimony.

**Request No. 9** — No relationship between pre-closing issues and Cron's later decision. Defendant next asked R&R to admit that Cron pulled her work for reasons "unrelated to any issues" existing as of June 16, 2023. (Dkt. 130, Ex. C, Req. No. 9.) That categorical formulation required R&R to disclaim *any* causal significance whatsoever from the pre-closing performance problems, even though Cron had said those problems dated back months and had genuinely threatened before closing to shift work unless PLDG improved. And in light of Mr. Hagemann's statement to Ms. Rahn that problems had existed for at least a year as of December 2023. In addition, the context of the claim is relevant as well. R&R contended that if it had known about the undisclosed pre-closing UHG issues, it would not have proceeded with the sale. The Court agreed in its pre-trial motion rulings that the relevant inquiry was whether Lauritsen and other PLDG employees believed that UHG "was dissatisfied at the time of the sale." (Dkt. 110 at pp. 8-9.) R&R had reasonable grounds to decline

this sweeping causal admission.

**Request No. 10** — R&R's ownership and Rahn's conduct as the cause of termination. Request No. 10 asked R&R affirmatively to accept Defendant's theory that UHG terminated its relationship because of PLDG's direction under R&R and concerning behavior by Rahn. R&R denied that proposition. The May 2026 record contained evidence of significant problems in the UHG relationship predating R&R's ownership, including Cron's dissatisfaction and threat to shift work. Against that evidence, R&R had a reasonable basis not to concede Defendant's alternative causal theory as established fact and to proceed to trial on the issue of whether UHG was dissatisfied at the time of the sale.

**Request No. 11** — No relationship between UHG's termination and pre-closing issues. Like Request No. 9, Request No. 11 asked R&R to admit that UHG's termination was "unrelated to" pre-closing issues or disputes. R&R reasonably declined that categorical proposition for the same reason: the contemporaneous record provided evidence from which R&R could argue that pre-closing performance problems contributed to the deterioration of the relationship, even if post-closing events also contributed to UHG's ultimate decision and/or served as the "final straw."

**Request No. 13** — Intent to terminate or materially reduce business. Defendant asked R&R to admit that UHG had not indicated an intent to terminate or materially reduce its business relations with PLDG as of closing. Yet Cron had expressly warned that, absent improvement, she might shift work to another vendor, and at deposition she confirmed that the warning was genuine and true when made.

(Dkt. 78, Cron Dep. 59:23–60:18.) R&R therefore had a direct evidentiary basis to dispute the categorical proposition that UHG had given no indication that it might materially reduce its business, and R&R had a right to have the Court determine at trial if material undisclosed facts from prior to the closing constituted fraudulent inducement under Delaware law.

**Request No. 14** — No breach of the SPA concerning UHG. Request No. 14 asked R&R to concede the ultimate proposition that Defendant did not breach the SPA with respect to UHG's status as a customer. R&R's UHG theory rested on the undisclosed pre-closing circumstances described above and its interpretation of Defendant's obligations under the SPA. Because R&R had reasonable grounds for the underlying factual and contractual positions on which that claim depended, it was not required to abandon those positions by admitting the ultimate breach proposition.

**Request No. 15** — No breach concerning UHG as a material customer. R&R's response to Request No. 15 further demonstrates that it was not indiscriminately denying propositions concerning UHG. R&R objected that UHG's "status" as a material customer was vague, but expressly admitted that UHG had been properly identified as a material customer if that was the intended meaning. (Dkt. 130, Ex. D, Resp. No. 15.) R&R denied the request only insofar as it sought a broader concession that Defendant had accurately disclosed the circumstances concerning UHG at closing and therefore had committed no breach. Given the undisclosed Cron communication and the other evidence described above, R&R had reasonable grounds for that qualification.

The record demonstrates that R&R had a reasonable basis for its responses to Defendant's requests for admission. Some requests implicated competing historical evidence; some required R&R to broadly characterize the significance of certain facts; some required legal interpretation and application of the SPA; and some asked R&R to accept categorical causal propositions despite evidence supporting competing inferences. The responses reflect a party maintaining disputed positions supported by the record—not a party frivolously refusing to admit matters for which it had no reasonable basis to believe it might prevail.

### B. The Circumstances here are Those Courts have Found Sufficient Under Rule 37(c)(2)(C) to Meet the "Reasonable Grounds" Standard.

The circumstances demonstrated above fall squarely within those courts have found sufficient to establish a "reasonable ground to believe that [the responding party] might prevail." Fed. R. Civ. P. 37(c)(2)(C).

In *JD Factors, LLC v. FreightCo, LLC*, No. 1:09-CV-95, 2010 WL 4316881, at *4–5 (N.D. Ind. Oct. 25, 2010), the court denied Rule 37(c)(2) sanctions where the responding party maintained that it lacked knowledge of an assignment because it disputed whether it had received notice. Although the court ultimately rejected that position on *summary judgment*, the dispute surrounding delivery of the notice, together with the necessity of interpreting the governing notification statute, provided reasonable grounds to believe the party <u>might</u> prevail. *Id.* R&R confronted the same combination here: disputed facts concerning the UHG relationship and unresolved questions concerning what those facts meant legally under the SPA and Delaware law. Requests Nos. 3, 6, 14, and 15 all asked R&R to accept Defendant's

interpretation of the contractual significance of certain facts. As in *JD Factors* (where, unlike here, the responding party lost on summary judgment, indicating there was no factual situation on which the responding party ultimately could have prevailed, but they still were not sanctioned), the existence of contrary evidence did not eliminate the reasonable factual and legal basis for R&R's position.

*Arlington Specialties, Inc. v. Urban Aid, Inc.*, No. 13-CV-4180, 2015 WL 1841444, at *4–5 (N.D. Ill. Apr. 21, 2015), is also instructive. There, the court declined to award Rule 37(c)(2) sanctions because the responding party reasonably believed it could prevail on issues that required a detailed review of competing evidence and presented disputed factual and legal questions. *Id.* That describes the UHG issues here. As detailed above, the May 2026 record contained competing testimony and other evidence. The RFAs required R&R to draw wholesale conclusions from that competing record concerning dissatisfaction, risk, materiality, disclosure, breach, and causation. Rule 37(c)(2)(C) did not require R&R to adopt Defendant's inferences merely because Defendant possessed some evidence supporting them.

Indeed, this case presents all the circumstances courts have consistently recognized as supporting reasonable grounds: a genuinely disputed factual record; mixed factual and legal questions requiring application of a governing standard to those facts; and competing testimony and inferences whose significance depended on the factfinder's evaluation of the evidence.

Rule 37(c)(2)(C) does not require R&R to show that its position was certain to prevail, more likely than not to prevail, or ultimately correct. The Rule asks

whether R&R had "a reasonable ground to believe that it might prevail." *Pecore*, 664 F.3d at 1136–37. Defendant's argument rests on hindsight—the fact that R&R lost after a five-day bench trial does not mean it acted unreasonably when it responded to RFAs months earlier. The May 2026 record readily satisfies the legal standard. R&R had evidence supporting the matters it maintained, reasonably disputed Defendant's competing characterizations and causal inferences, and reasonably maintained its interpretation and application of the SPA. The Rule 37(c)(2)(C) exception therefore applies, and no expenses should be awarded.

## II. SEPARATE FROM R&R'S BASIS FOR DENIAL, DEFENDANT HAS NOT ESTABLISHED THAT SHE "PROVED" EACH DENIED MATTER WITHIN THE MEANING OF RULE 37(C)(2).

Independent of R&R's reasonable basis for its denials, Rule 37(c)(2) only permits an award of expenses when a party fails to admit a "matter" that the requesting party later proves to be true. Defendant's ultimate success at trial on the UHG claim does not, standing alone, establish that the specific factual matters R&R declined to admit were proven true. *United States v. Menominee Tribal Enters.*, No. 07-C-316, 2010 WL 2465505, at *9 (E.D. Wis. June 15, 2010).

*In Pecore,* the defendants prevailed at trial and sought fees under Rule 37(c)(2) based on the government's failure to admit requests concerning the underlying conduct. 664 F.3d 1125. The court denied the request because the defense verdict established only that the government had failed to prove its *claims*; it did not establish that the defendants had affirmatively proven the particular *matters* contained in their requests for admission. *Id.*

The same distinction applies here. Defendant begins from the premise

that, because the Court entered judgment against R&R on its UHG *claim*, she necessarily proved the substance of each denied request. She even asserts in her brief that "[w]hether **explicitly or implicitly**, the Court found in favor of Ms. Lauritsen on each of the matters raised in the requests for admission." (Dkt. 131 at 14.) (Emphasis added.) But an implicit inference from an ultimate judgment is not the same thing as proving a specific "matter." Several of the findings Defendant identifies do not establish the propositions contained in the corresponding requests.

Request No. 1 illustrates the problem. Defendant asked R&R to admit that "UHG had not been dissatisfied with PLDG's services and work product for at least a year prior to June 16, 2023." (Dkt. 130, Ex. C, Req. No. 1.) As proof of that proposition, Defendant points to the Court's finding that nothing Hagemann said or suggested, and nothing in the 2022 PowerPoint, constituted notice of problems warranting disclosure to Rahn. (Dkt. 131 at 14 (quoting Dkt. 127 at 6:3–13).) But whether UHG had experienced dissatisfaction during the preceding year is not the same question as whether that dissatisfaction was *sufficiently significant* to put Defendant on notice of a problem requiring disclosure under the SPA. The latter finding does not affirmatively establish the former proposition. R&R had a right to present evidence at trial so the Court could determine whether it believed Defendant had failed to disclose material facts under the SPA and Delaware law.

Request No. 10 is another example where Defendant asked R&R to admit a more specific proposition than the Court ultimately found. This request asked R&R to admit that UHG terminated its relationship with PLDG "because of the

direction of PLDG under its new ownership by R&R and concerning behavior exhibited by Sara Rahn." (Dkt. 130, Ex. C, Req. No. 10.) Yet the finding Defendant cites establishes that PLDG was poorly positioned to respond because "the vast majority of the incumbent employees" had departed. (Dkt. 131 at 17 (quoting Dkt. 127 at 11:16–25).) That finding does not establish the full conjunctive proposition Defendant actually asked R&R to admit—including that UHG terminated the relationship because of "concerning behavior exhibited by Sara Rahn."

Request No. 13 suffers from a similar disconnect. That request asked R&R to admit that UHG had not indicated an intent to "terminate or materially reduce its business relations with PLDG as of June 16, 2023." (Dkt. 130, Ex. C, Req. No. 13.) Defendant relies on the Court's finding that Cron did not indicate that UHG would "terminate contracts" or "withdraw contracts." (Dkt. 131 at 17.) But that finding does not necessarily resolve whether UHG had indicated an intent to *materially reduce* its business with PLDG—a separate proposition included in the request. Indeed, it was undisputed that Cron expressly warned before closing that she "may have to shift some work" away from PLDG if its performance did not improve. (Dkt. 131 at 4.) The Court's conclusion that this did not amount to an expressed intent to terminate or withdraw contracts and therefore did not rise to the level of violating the representations in the SPA does not itself establish that Defendant proved the broader negative proposition in Request No. 13.

The summary chart below further illustrates the distinctions between the requests, R&R's responses, and the Court's ultimate findings.

| RFA | Matter Requested | R&R's Response / Basis | Court's Ultimate Finding |
|---|---|---|---|
| **1** | UHG had not been dissatisfied with PLDG's services/work product for at least a year before June 16, 2023. | **Denied.** R&R relied on 2023 sales plans identifying Hagemann as a "threat," descriptions of him as demanding, Hagemann's testimony that it would not surprise him if he had said performance problems existed for "at least a year," and Rahn's recollection that he did. | The Court found that nothing Hagemann said or suggested, or the 2022 PowerPoint, constituted notice of a problem warranting disclosure to Rahn. (Dkt. 127 at 6:3-13.) |
| **2** | PLDG was not at risk of losing UHG as a customer as of June 16, 2023. | **Denied.** Cron confirmed that her warning was genuine, that PLDG's work had become "slower and sloppier," and that she would consider shifting work to another vendor absent improvement. Gangelhoff characterized the situation as "incredibly concerning," and PLDG immediately implemented unusual measures specific to Cron's account. (Dkt. 78, Cron Dep. 58:5–12, 59:23–60:18, 62:6–23, 64:10–18; Dkt. 81, Gangelhoff Dep. 31:4–33:4, 51:3–53:11.) | The Court acknowledged Cron was genuinely dissatisfied but found her complaint did not represent a "crisis" and did not rise to the level where it had to be disclosed under the SPA or Delaware common law. (Dkt. 127 at 7:2–8:2.) |
| **3** | UHG did not have a material dispute with PLDG as of June 16, 2023. | **Objected and denied.** R&R objected that "material dispute" required interpretation and application of the SPA and relied on the evidence concerning Cron's genuine threat to shift work and PLDG's response to that threat. | The Court interpreted § 3.19(a) to not apply because Cron's email did not indicate a "dispute"; the Court construed "dispute" as requiring adverse positions and found none. (Dkt. 127 at 8:10–9:8.) |
| **4** | There was not a clear and material threat to PLDG's | **Denied.** R&R relied on Cron's genuine warning that she might shift work absent improvement, Gangelhoff's characterization of | The Court found that Cron's complaint was sincere but was not a crisis or risk to the relationship and did not rise to |

| | | | |
|---|---|---|---|
| | UHG business as of June 16, 2023. | the situation as "incredibly concerning," and PLDG's immediate escalation and client-specific remedial measures. (Dkt. 78, Cron Dep. 59:23–60:18; Dkt. 81, Gangelhoff Dep. 31:4–33:4, 51:3–60:8.) | the level of materiality necessary to violate the SPA. (Dkt. 127 at 7:2–8:2.) |
| **5** | UHG did not intend to remove PLDG from its preferred-vendor list as of June 16, 2023. | **Denied.** R&R relied on UHG's threat to shift business away from PLDG because of poor performance, the internal escalation of that threat to PLDG's President and CEO, and PLDG's assessment of the ensuing client call as "not good." R&R maintained that these circumstances created a risk of losing UHG, including by removal from its preferred-vendor list. | The Court found that Cron's statement that she "may have to shift some work" was not an indication that UHG would terminate or withdraw contracts, and that she did not express an intent to withdraw work. (Dkt. 127 at 9:9–17.) |
| **6** | Defendant did not conceal any material dispute between PLDG and UHG. | **Denied.** R&R maintained that Defendant concealed a material dispute based on the undisclosed Cron communication and related pre-closing evidence. | The Court interpreted there to be no "material dispute" under § 3.19(a) because no adverse positions existed between UHG and PLDG. (Dkt. 127 at 8:10–9:8.) |
| **8** | Cron pulled her work in December 2023 because of employee resignations between June and December 2023. | **Partially admitted.** R&R admitted Cron testified that the resignations of two employees were the "final straw," but denied that this was the *singular reason* for losing UHG business or that pre-closing issues played no role. | The Court found that the employee departures left PLDG poorly positioned to serve UHG and that Cron relied heavily on the experienced employees who had departed. (Dkt. 127 at 14:14–21.) |
| **9** | Cron pulled her work for reasons unrelated to any issues | **Denied** for the reasons stated in response to No. 8. R&R disputed the broader causal proposition that pre-closing problems played no role merely | The Court found that the employee departures left PLDG poorly positioned to serve UHG and that Cron relied heavily on the experienced employees |

| | | | |
|---|---|---|---|
| | existing as of June 16, 2023. | because later employee departures were the immediate trigger. | who had departed. (Dkt. 127 at 14:14–21.) |
| **10** | UHG terminated because of PLDG's direction under R&R and concerning behavior by Rahn. | **Denied.** R&R denied Defendant's assertion that UHG terminated its relationship with PLDG because of PLDG's direction under R&R's ownership and concerning behavior by Rahn. | The Court found that the employee departures left PLDG poorly positioned to serve UHG and that Cron relied heavily on the experienced employees who had departed. (Dkt. 127 at 14:14–21.) |
| **11** | UHG terminated for reasons unrelated to pre-closing issues or disputes. | **Denied** for the reasons stated above. Like Nos. 8–10, this request concerned the distinct question of ultimate causation rather than simply the condition of the UHG relationship at closing. | The Court found that the employee departures left PLDG poorly positioned to serve UHG and that Cron relied heavily on the experienced employees who had departed. (Dkt. 127 at 14:14–21.) |
| **13** | UHG had not indicated an intent to terminate or materially reduce its business relations with PLDG as of June 16, 2023. | **Denied.** Cron expressly warned that, absent improvement, she would consider shifting work to another vendor and confirmed at deposition that the warning was genuine and "true when [she] said it." (Dkt. 78, Cron Dep. 59:23–60:18.) | The Court found that the employee departures left PLDG poorly positioned to serve UHG and that Cron relied heavily on the experienced employees who had departed. (Dkt. 127 at 14:14–21.) |
| **14** | Defendant did not breach the SPA with respect to UHG's status as a customer. | **Denied.** R&R maintained that the undisclosed UHG circumstances—including Cron's pre-closing warning—triggered Defendant's obligations under the SPA. | The Court concluded legally that the failure to disclose the Cron email did not violate the SPA and that the email did not rise to the level of materiality required for a breach. (Dkt. 127 at 7:23–8:2.) |
| **15** | Defendant did not breach the SPA regarding UHG's status | **Qualified response.** R&R objected that "status" was vague, admitted that UHG was properly identified as a material | The Court concluded legally that Defendant's failure to disclose the Cron email did not violate the SPA and did not |

| | | | |
|---|---|---|---|
| | as a material customer. | customer if that was what Defendant meant, but denied that Defendant had accurately disclosed the circumstances concerning UHG at closing. | make her representations concerning PLDG misleading. (Dkt. 127 at 7:23–8:2.) |

Rule 37(c)(2) does not impose expenses wholesale based on the outcome of a *claim*. It requires the requesting party to establish that the particular "matter" not admitted was later "prove[n] . . . true." Fed. R. Civ. P. 37(c)(2). Defendant cannot establish Rule 37(c)(2)'s threshold requirement merely by pointing to the judgment and claiming the Court "implicitly" resolved every requested matter in her favor. Even assuming Defendant established certain issues at trial covered by the requests, it still failed to meet its burden under Rule 37(c)(2) because several of the matters for which Defendant seeks expenses were not affirmatively proven true as framed, and therefore Rule 37(c)(2) does not authorize an award of expenses incurred in purportedly proving those matters.

## III. ALTERNATIVELY, DEFENDANT HAS NOT ESTABLISHED THAT THE REQUESTED $53,905.02 WAS "INCURRED IN MAKING" THE ALLEGEDLY NECESSARY PROOF.

Rule 37(c)(2) permits recovery only of reasonable expenses "incurred in making" the proof necessitated by the failure to admit. Accordingly, there must be "a sufficient causal nexus between the expenses claimed, and the failure to admit." *Hicklin Eng'g, L.C. v. Bartell*, No. 00-C-1516, 2005 WL 3805914, at *1 (E.D. Wis. Mar. 31, 2005). *Hicklin* frames the required counterfactual precisely: "if the party to whom the requests were sent had admitted the matters that it should have admitted, which facts would the propounding party not have to prove?" *Id.* The recoverable expense is

the ***reasonable cost of making that otherwise unnecessary proof***—not the cost of litigating a claim to which the denied matters happened to relate.

Defendant's request departs from that limitation at each step. First, Defendant treats admission of the 13 UHG RFAs as though it would have eliminated the UHG claim altogether, without identifying the particular proof made necessary by each failure to admit. Second, Defendant uses an across-the-board one-third allocation to sweep broad categories of ordinary pretrial preparation and trial work into the request based on UHG's prominence in the case, rather than demonstrating that those expenses were caused by the need to prove denied matters. Third, Defendant further approximates the requested amount using a blended rate rather than tying the award to the actual timekeeper-specific expenses reflected in the billing records. The result is not a reliable accounting of expenses "incurred in making" particular proof, but an attempt to shift a substantial portion of Defendant's overall cost of preparing for and attending trial. That is not sufficient to satisfy the standard required under Rule 37(c)(2).

### A. Defendant's Claim-Level Counterfactual does not Establish the Required Causal Nexus.

Defendant's calculation conflates two counterfactuals. Rule 37(c)(2) asks what particular proof Defendant would not have had to make if R&R had admitted the particular matters requested. Defendant instead asks, in substance, *how much work Defendant would have avoided if the UHG claims had disappeared from the case altogether*. That substitution breaks the causal chain required by *Hicklin*: it identifies costs associated with litigating the UHG claims, not costs caused by R&R's failure to

admit particular matters.

Defendant's own explanation makes the substitution explicit. She argues that "a substantial portion of the pretrial work and trial work involved the UHG claims" and that the proceedings "would have been considerably shorter" had the UHG claims been dismissed. (Dkt. 131 at 24.) But dismissal of the UHG claims is not the counterfactual prescribed by Rule 37(c)(2). R&R was served with 15 requests for admission. Even assuming every matter that should have been admitted had been admitted, the relevant question remains what specific proof those admissions would have rendered unnecessary. *Hicklin*, 2005 WL 3805914, at *1.

The distinction is consequential because the challenged 13 RFAs did not collectively resolve every issue implicated by the UHG claims. They addressed particular propositions concerning pre-closing dissatisfaction and risk, the existence and materiality of a "dispute," disclosure and breach, and the causes of UHG's later departure. Defendant nevertheless had to litigate issues extending beyond the particular matters addressed by the RFAs, respond to R&R's remaining evidence and theories, prepare relevant witnesses, and establish any facts independently necessary to her defenses. An admission may narrow the proof required on a particular matter; it does not necessarily make an entire claim, witness, exhibit, or trial issue vanish.

Defendant's own description of her UHG presentation demonstrates the breadth of the distinction. She identifies Cron's and Hagemann's deposition testimony, Rahn's cross-examination, testimony from Defendant, Clarke, Gangelhoff,

Fox, Rogge, Block, Keller, and Ghazi, dozens of exhibits, evidence concerning employee departures, and evidence concerning Rahn's post-closing leadership. (Dkt. 131 at 10–11, 14.) Much of that evidence bore on the UHG claim—what happened before closing, what happened afterward, the operation of the SPA, the reasons employees departed, and why UHG eventually moved its business. The fact that some of that evidence also bore on matters contained in the RFAs does not establish that the expense of preparing and presenting that evidence was "incurred in making" proof necessitated by R&R's failure to admit.




Rather than confront that issue, Defendant moves directly from "this work concerned UHG" to "this work would have been reduced if the UHG claims were gone." That is claim-level fee shifting, not the matter-specific causal inquiry Rule 37(c)(2) requires. The distinction is especially important given the narrow function of Rule 37(c)(2). Under the American Rule, parties ordinarily bear their own attorney's fees absent an applicable fee-shifting rule. Rule 37(c)(2) supplies a limited exception for the reasonable expense of proving a specific matter that should have been

admitted; it does not make the losing party responsible for the prevailing party's cost of litigating the associated claim.

Put another way, Rule 37(c)(2) authorizes fees in very limited circumstances for proving matters inside the smaller circle in the image above, not for litigating all issues contained in the larger circle. But Defendant's approach would effectively do the latter—use the RFAs as a vehicle to recover a substantial portion of the ordinary expense of defending the UHG claims without identifying the particular proof that an admission actually would have eliminated.

### B. Defendant's One-Third Allocation and Blended Rate Assumes, Rather than Establishes, the Required Causal Nexus.

Defendant's second problem compounds the first. For the "blue" category alone, Defendant seeks $35,951.40 based on 271.4 hours of work. Yet Defendant expressly acknowledges that every entry in that category "would have been required to have been performed even had the admissions been made." (Dkt. 131 at 23.) Defendant contends only that "smaller versions" of those entries would have been necessary. (*Id.*)

Rather than identify those supposed reductions by entry—or otherwise connect them to proof made necessary by a particular denial—Defendant simply assigns one-third of the entire category to R&R. The one-third figure is based principally on how much of the parties' briefing, R&R's closing presentation, and the Court's decision concerned UHG, together with the financial significance of the UHG claims. (Dkt. 131 at 23–24.) But Defendant's analysis gets it backwards. Rather than identify specific costs incurred as a result of the denials, Defendant instead starts

with the total expenses and then allocates an arbitrary percentage to the total.

Those metrics establish, at most, that UHG was an important part of the litigation. *They say nothing about what percentage of Defendant's attorney time would have been avoided had R&R admitted the RFAs*. A page of a trial brief is not an attorney hour. A page of the Court's decision is not an attorney hour. And the percentage of R&R's closing presentation devoted to UHG says even less about what expenses Defendant incurred from R&R's failure to admit. The one-third multiplier does not measure the causal nexus required by *Hicklin*; it just assumes one.

The consequences are particularly stark because the blue category sweeps in broad categories of ordinary trial preparation. On June 5, for example, counsel billed 4.0 hours reviewing deposition transcripts of Cron, Hagemann, Marvin, and Gosslin and preparing trial designations, combining UHG and non-UHG witnesses in a single entry. Counsel separately billed 4.4 hours reviewing potential trial exhibits and preparing the exhibit list, and another 7.5 hours researching and drafting motions *in limine* addressing three separate subjects—"UHG hearsay, accounting expert, and non-disclosed opinions." (Wheeler Decl. Ex. A at 2.) Defendant identifies no basis for concluding that exactly one-third of those mixed tasks was necessitated by denied RFAs. Much less address the fact that the UHG motions *in limine* (other than regarding one statement by Hagemann the Court excluded as hearsay) were denied.

Other entries make the disconnect even more apparent. Defendant seeks to allocate portions of work devoted to trial strategy, witness preparation,

exhibit review, and other tasks necessary to prepare this multi-claim case for trial. Yet Defendant already concedes that those tasks would have been performed even if the admissions had been made. The issue is therefore not whether those tasks had some connection to UHG; it is whether Defendant has shown what additional portion of each task was incurred because R&R failed to admit a specific request. A blanket one-third allocation cannot and does not make that showing.

Trial attendance is another example. Defendant's attorneys necessarily would have attended the multi-day trial regardless of R&R's answers to the UHG RFAs because other claims remained for adjudication. Even if one-third of the trial concerned UHG, it does not follow that one-third of counsel's cost of attending trial was caused by the RFA denials. Counsel would have been in court anyway.

*Prepared Food Photos, Inc. v. Sharif Jaber*, No. 22-CV-642-JPS-JPS, 2026 WL 766226, at *7 (E.D. Wis. Mar. 18, 2026) addresses essentially this problem. There, the Rule 37(c)(2) request included billing for settlement and scheduling matters, broad trial preparation, and nearly $10,000 for entire trial days, although only a small portion of that work was realistically attributable to proving the matters the defendant had failed to admit. *Id.* The court concluded that the requested fees were "far in excess" of the fees "incurred in making [the] proof" and would have been subject to significant reduction even if the threshold requirements for Rule 37(c)(2) relief had otherwise been satisfied. *Id.*

The same defect is present here, but Defendant's one-third multiplier does not cure it. *Prepared Food Photos* did not treat the percentage of the overall

litigation devoted to the denied matters as a substitute for causation. It focused on whether the claimed work was realistically attributable to making the proof necessitated by the failure to admit. *Id.* General trial preparation and entire trial days swept too broadly. So too here.

The problem is therefore not simply that one-third is an arbitrary or imprecise percentage. It is that Defendant applies that percentage to a pool of expenses that admittedly includes work her attorneys would have performed anyway. An arbitrary allocation of otherwise nonrecoverable litigation expenses does not transform them into expenses "incurred in making" proof. At minimum, the $35,951.40 attributed to the blue category cannot be sustained, as there is no evidence connecting the requested amounts to work that actually would have been avoided had the appropriate admissions been made.[1]

Rule 37(c)(2) does not permit Defendant to recover expenses merely because they were associated with UHG. *Hicklin* requires a "sufficient causal nexus" between R&R's failure to admit a particular matter and Defendant's expense in proving that matter. *Hicklin*, 2005 WL 3805914, at *1. Defendant has not established that nexus. She substitutes the hypothetical elimination of the UHG claims for the proof actually avoided by an admission, allocates one-third of broad litigation expenses based on UHG's prominence in the case, and applies further approximations to calculate the resulting amount. At no point does Defendant identify the particular

[1] Defendant also improperly approximates the requested amount using a blended rate rather than tying the award to the actual timekeeper-specific expenses reflected in the billing records, which does not meet the requirements under the law.

proof an admission would have eliminated and tie the requested expense to making that proof.[2] The requested $53,905.02 therefore was not shown to have been "incurred in making" the allegedly necessary proof and should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant Peggy Lauritsen's motion for attorneys' fees.[3]

Dated this 21st day of August, 2026.

Respectfully submitted,

s/*Aaron H. Aizenberg*


Stephen E. Kravit
State Bar No. 1016306
Aaron H. Aizenberg
State Bar No. 1066340
Benjamin J. Glicksman
State Bar No. 1086852
825 North Jefferson St., Ste. 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (telephone)
(414) 271-8135 (facsimile)
kravit@kravitlaw.com
aha@kravitlaw.com
bjg@kravitlaw.com
*Attorneys for Plaintiff*


[2] Defendant should not be allowed to attempt to make this showing for the first time on reply.

[3] Plaintiff is in receipt of Defendant's response to Plaintiff's opposition to Defendant's Bill of Costs. Plaintiff stands on its prior objection to Defendant seeking reimbursement of costs for a transcript from a phone call she secretly recorded, never introduced into evidence, and which was designated in her pre-trial submission to be used with a witness she ended up deciding to withdraw from her trial witness list at the beginning of trial. Defendant does not intend on filing another brief or submission on this objection and will stand on her prior objection to that specific cost being awarded.